## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| VIRGINIA HOSPITAL & HEALTHCARE ASSOCIATION, <br><br> THE MEDICAL SOCIETY OF VIRGINIA, and <br><br> VIRGINIA COLLEGE OF EMERGENCY PHYSICIANS, <br><br><div align="right">*Plaintiff*s,</div><br> v. <br><br> KAREN KIMSEY, in her official capacity as Director of the Virginia Department of Medical Assistance Services, <br><br><div align="right">*Defendant.*</div> | No. 3:20-cv-587 |

## VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Virginia Hospital & Healthcare Association (VHHA), The Medical Society of Virginia (MSV), and Virginia College of Emergency Physicians (VACEP) bring this complaint against defendant Karen Kimsey, in her official capacity as Director of the Virginia Department of Medical Assistance Services (DMAS), and allege as follows:

### INTRODUCTION AND NATURE OF THE ACTION

1.     This case centers on the Virginia General Assembly's decision, in the midst of a global pandemic, to bilk of tens of millions of dollars those hospitals and physicians who treat Medicaid patients. That counterproductive decision will cause irreparable harm not only to needy patient populations, but also to hospitals and physician practices themselves, which are already struggling with increased costs and decreased revenue due to the challenges of the COVID-19 pandemic. The Commonwealth's taking of earned revenue will impair providers' ability to deliver care to patients, at a time when the public is counting on hospitals and doctors more than ever.

2.      During a one-day legislative session to finalize the state's budget in April 2020, the General Assembly enacted two cost-cutting measures, Budget Items 313.AAAAA and 313.BBBBB (the Budget Items), that single out hospitals and physician practices that provide critical medical services to Virginia's most vulnerable populations under the Medicaid program.

3.      Budget Item 313.AAAAA (the Downcoding Provision) directs DMAS to cut Medicaid reimbursements to hospitals for emergency-department visits that are deemed after the fact to have been "preventable" or "avoidable," based solely upon the patient's final diagnosis. More particularly, it directs DMAS to "downcode" more complex emergency department encounters and to reimburse them as though the hospital and doctor had provided fewer or simpler services than they actually did. By DMAS's own estimate, this change will lower Medicaid payments to Virginia hospitals and physicians by more than $40 million per year.

4.      Budget Item 313.BBBBB (the Readmission Provision) similarly denies hospitals the full value of the services they have provided. It does so by requiring DMAS to pay hospitals just *half* of the customary reimbursement amount for claims for Medicaid patients who are readmitted to the hospital within 30 days of a prior discharge when readmission is deemed after the fact to have been "potentially preventable." By DMAS's own estimate, this change will lower Medicaid payments to Virginia hospitals by nearly $15 million per year.

5.      When a state singles out particular parties to bear economic burdens that ought to be borne by the public as a whole, the federal Takings Clause is implicated. That is precisely what these Budget Items do. The problems of preventable emergency department visits and repeated hospital readmissions among the Medicaid population are well recognized and have numerous and complex causes. The primary causes— limited access to primary care and social services among underserved populations—

have economic, social, and political dimensions and are not within hospitals' or physicians' control. Yet the Budget Items target hospitals and physician practices alone to bear the cost of these systemic problems, by seizing from them the economic value of the services they provide. The Takings Clause forbids such measures.

6.      The Budget Items are also preempted by federal statutes and regulations because they deny health care providers payments necessary to ensure efficiency, economy, and quality of care for Medicaid patients and mandate partial payment for emergency services in circumstances where federal law requires full payment.

7.      The high rates of emergency department use and hospital readmission among Medicaid beneficiaries are problems worth addressing. But Virginia may not unlawfully take economic value from hospitals and physicians to offset the costs of public problems that rightfully should be borne by the public as a whole, through system-wide health care and social services reform.

8.      The Court should accordingly declare the Budget Items unlawful and enjoin Defendant from enforcing them.

**PARTIES**

9.      Plaintiff Virginia Hospital & Healthcare Association formed in 1926 as a trade association of Virginia hospitals. Its membership now includes 26 member health systems, representing 110 community, psychiatric, rehabilitation, and specialty hospitals throughout Virginia, including their long-term care facilities and services, ambulatory care sites, home health services, and other health system-related entities. VHHA's members provide essential health care services in their communities, including trauma, emergency, and intensive care services, and they play a central role in responding to public health emergencies like the COVID-19 pandemic. VHHA represents the interests of its members before federal and state governments, various regulatory agencies, and the public, to improve access to care; improve health care safety, quality, and service; to

promote a vibrant, high-value health care system; and to advance population health to promote well-being and economic opportunity for all Virginians.

10.     The interests that VHHA seeks to protect in this suit are germane to the organization's purpose.

11.     VHHA's members would have standing to sue in their own right if VHHA were not bringing this suit on their behalves. At the same time, neither the claims asserted nor the relief requested require the participation of individual members.

12.     Plaintiff Medical Society of Virginia, founded in 1820, is a nonpartisan, physician-led membership association. It represents the interests of physicians, other medical caregivers, and patients throughout Virginia. It believes that doctors must play an active role in the development of health care policy for the state and continually represents the physician and patient voice in Virginia. MSV's overarching mission is to better equip the physician community to improve the health of Virginians.

13.     The interests that MSV seeks to protect in this lawsuit are germane to the organization's purpose.

14.     MSV's members would have standing to sue in their own right if MSV were not bringing this suit on their behalves. At the same time, neither the claims asserted nor the relief requested require the participation of individual members.

15.     Plaintiff Virginia College of Emergency Physicians has been the voice of emergency medicine in Virginia since 1970 and represents more than 1,000 emergency physicians in many different settings, in both community and academic practice throughout Virginia. As a collective specialty group, VACEP advocates for the rights of patients and emergency physicians, who stand ready 24/7/365 to see any patient, at any time, for any condition. VACEP's members are frontline providers who are obligated to treat every patient who comes to the emergency department. VACEP is recognized

statewide by elected officials, government agencies, health care organizations, insurers and medical colleagues for its advocacy on behalf of emergency physicians and patients.

16. The interests that VACEP seeks to protect in this suit are germane to the organization's purpose.

17. VACEP's members would have standing to sue in their own right if VACEP were not bringing this suit on their behalves. At the same time, neither the claims asserted nor the relief requested require the participation of individual members.

18. Defendant Karen Kimsey is Director of the Virginia Department of Medical Assistance Services, which is charged with enforcing the Budget Items. She is sued in her official capacity. Director Kimsey maintains offices at 600 East Broad Street, Suite 1300, Richmond, Virginia 23219.

## JURISDICTION AND VENUE

19. Plaintiffs seek declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and injunctive relief under 42 U.S.C. § 1983.

20. This Court's jurisdiction is invoked under 28 U.S.C. § 1331.

21. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this district and because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

## FACTUAL ALLEGATIONS

### A.    Enactment of the Budget Items

22. On April 22, 2020, the Virginia General Assembly convened for a one-day legislative session. This session, referred to as a "reconvened session," occurs after each regular or special legislative session is adjourned for the purpose of reconsidering bills that the Governor has vetoed. *See* Va. Const. art. IV, § 6, cl. 3.

23. At this session, the Governor proposed and the General Assembly approved a reduced state budget in response to the COVID-19 pandemic.

24.     Among the measures included in the budget were two provisions in Item
313 that affect reimbursement for hospital services provided to beneficiaries of the
state's Medicaid program: Budget Items 313.AAAAA and 313.BBBBB.

25.     The first of these budget items—the Downcoding Provision—instructs
DMAS to "amend the State [Medicaid] Plan . . . to allow the pending, reviewing and the
reducing of fees for avoidable emergency room claims for codes 99282, 99283 and 99284,
both physician and facility." 2020 Va. Acts ch. 1289, at 369.

26.     In particular, "[i]f the emergency room claim is identified as a preventable
emergency room diagnosis, the department shall direct the Managed Care Organiza-
tions to default to the payment amount for code 99281, commensurate with the acuity
of the visit," even if the encounter is correctly coded as a 99282, 99283 or 99284 encoun-
ter. 2020 Va. Acts ch. 1289, at 369.

27.     In plain English, this provision requires managed care organizations to
determine whether each emergency department visit by a covered Medicaid beneficiary
is "avoidable," based solely on the final diagnosis and without any independent review
of the facts and circumstances. If the visit is deemed "avoidable," the MCO is to reim-
burse for the encounter as if the hospital and physician had provided fewer or simpler
services to the patient than they actually did.

28.     The second budget item—the Readmission Provision—instructs DMAS to
"amend the State [Medicaid] Plan . . . to modify the definition of readmissions to in-
clude cases when patients are readmitted to a hospital for the same or a similar diagno-
sis within 30 days of discharge, excluding planned readmissions, obstetrical readmis-
sions, admissions to critical access hospitals, or in any case where the patient was orig-
inally discharged against medical advice." 2020 Va. Acts ch. 1289, at 369.

29.     "If the patient is readmitted to the same hospital for a potentially pre-
ventable readmission then the payment for such cases shall be paid at 50 percent of the

normal rate, except that a readmission within five days of discharge shall be considered a continuation of the same stay and shall not be treated as a new case." 2020 Va. Acts ch. 1289, at 369.

30.     In plain English, this measure provides that when a Medicaid beneficiary is admitted to a hospital and is discharged, but is then readmitted within 30 days for the same or a similar diagnosis, the readmission is automatically recharacterized as "potentially preventable," without any independent review of the facts and circumstances (such as possible comorbidities), and the hospital will be paid only *half* of the prescribed rate for the second admission.

31.     Pursuant to the Assembly's instructions, DMAS proposed an amendment to the State Plan to implement these Budget Items. *See* 36 Va. Reg. Regs. 2326, 2326 (June 8, 2020). The amendment became effective July 1, 2020. *Id.*

**B.     The Medicaid program and Medicaid population**

32.     "Medicaid is the nation's public health insurance program for those of limited means." *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 691 (4th Cir. 2019). It provides health insurance coverage to low-income children and their families; the elderly; pregnant women below a certain income level; and the disabled. *See id.*

33.     Unlike Medicare, which is operated exclusively by the federal government, the Medicaid program functions as a partnership between the federal government and the states.

34.     After a state elects to participate in the Medicaid program, the federal government shares the costs of providing medical assistance in a ratio that varies from state to state. In return, the state agrees to comply with the Medicaid statute and any administrative regulations properly promulgated by the Centers for Medicare and Medicaid Services (CMS). *See Md. Dep't of Health & Mental Hygiene v. CMS*, 542 F.3d 424, 429 (4th Cir. 2008).

35.     Congress designed the Medicaid program to ensure that states dispense federal funds in compliance with federal rules. *See Planned Parenthood S. Atl.*, 941 F.3d at 691.

36.     States must propose and submit Medicaid plans for the approval of CMS. Departures from federal requirements provide grounds for CMS to deny approval for a state's plan or to withhold Medicaid funding in whole or in part. 42 U.S.C. § 1396c.

37.     In Virginia, the state Medicaid program is administered by DMAS.

38.     To provide coverage to Medicaid-eligible Virginia residents, DMAS contracts with a number of Managed Care Organizations (MCOs), which in turn provide medical services to beneficiaries by contracting with a network of physicians, hospitals, and other health care providers.

39.     An MCO must "maintain adequate provider network coverage to serve the entire eligible population[] . . . twenty-four (24) hours per day, seven (7) days a week." DMAS, Medallion 4.0 Medicaid Managed Care Contract, § 4.7, perma.cc/3RB7-EKXW. To that end, the MCO must provide members with "an ongoing source of primary care appropriate to [their] needs." *Id.* § 8.1.F(c). The MCO must also "make arrangements to refer members seeking care after regular business hours to a covering physician," or "direct the member to go to the emergency room when a covering physician is not available." *Id.* § 4.7.

40.     Approximately 90% of Virginia Medicaid beneficiaries receive coverage through an MCO. *See* DMAS, *Virginia Managed Care Operational Report SFY19* at 1 (2020), perma.cc/9L6R-TV7Y.

41.     DMAS pays MCOs a per-member, per-month "capitation rate" to provide coverage to beneficiaries. DMAS, *Virginia Medicaid Managed Care Operational Report SFY19*, at 7. In exchange for these payments, MCOs assume the obligation to cover the reimbursable costs of beneficiaries' care.

42.    The remaining 10% of Medicaid beneficiaries in Virginia are covered by "fee-for-service" Medicaid, in which beneficiaries seek services directly from providers who are then reimbursed by the state.

43.    Overutilization of hospital emergency departments (ERs) is a recognized problem nationwide, particularly among Medicaid participants.

44.    Medicaid beneficiaries use the ER at almost twice the rate of privately-insured patients. *See* Cindy Mann, CMCS Informational Bulletin: Reducing Nonurgent Use of Emergency Departments and Improving Appropriate Care in Appropriate Settings 1 (Jan. 16, 2014), perma.cc/MZK7-V6E6 ("CMS Bulletin").

45.    Among the Medicaid population in 2007, 27% of children under 17 years, 38% of adults 18-44 years, and 39% of adults 45-64 years had at least one ER visit. Among the privately-insured population, the corresponding numbers were 17%, 17%, and 16%. CMS Bulletin 1, n.1.

46.    Medicaid beneficiaries tend to be in poorer health than the privately-insured population and are therefore more likely to seek treatment in the ER.

47.    Medicaid beneficiaries tend to have poorer access to appropriate primary care in their communities than the privately-insured population and are therefore more likely to seek treatment in the ER.

48.    An individual's health is dependent not only on access to medical care, but also on social determinants of health including public safety, access to food and water, educational and economic opportunities, and cultural and community support.

49.    Certain Medicaid beneficiaries are ER "super-utilizers." These patients account for an outsized percentage of ER visits because they "are more likely to have poor physical and mental health" and "no usual source of care." CMS Bulletin 3.

50.     Beneficiaries with behavioral health or substance abuse problems are disproportionately high utilizers of ERs.  About 12.5% of all ER visits across all payors are due to mental health or substance abuse treatment needs. CMS Bulletin 4.

51.     A greater proportion of individuals have behavioral health or substance abuse problems among the Medicaid population as compared with privately-insured individuals, increasing the likelihood of ER visits that will later be deemed "avoidable" or "preventable."

52.     Given the nature of emergency medical services, neither hospitals nor physicians have much, if any, direct influence on these broad public health issues.

53.     The Downcoding Provision is thus effectively a penalty assessed against hospitals and physician practices for providing services to Medicaid patients—services that the Medicaid program is failing to provide to these patients in primary care settings.

54.     Medicaid beneficiaries are more likely to be readmitted to a hospital within 30 days of having been discharged. *See* Anne Elixhauser & Claudia Steiner, Healthcare Cost & Utilization Project, *Readmissions to U.S. Hospitals by Diagnosis, 2010* (Apr. 2013), perma.cc/88NE-W7XE ("For conditions with both large numbers of stays and high readmission rates, Medicare and especially Medicaid patients were more likely to be readmitted than privately insured or uninsured patients."). That is often due to a variety of factors, including inadequate housing and nutrition; unaffordability of and lack of access to medication; unavailability of support services; and lack of access to appropriate primary care for follow-up appointments and ongoing treatment.

55.     Medicaid patients often return to the ER after an initial hospital discharge and subsequently are readmitted to the hospital solely because of a lack of appropriate care alternatives in the community. This phenomenon is particularly common among nursing home residents.

56.     The lack of housing resources and community-support resources for Medicaid patients leads to a disproportionately high risk of infection, which is a frequent cause of hospital readmissions.

57.     Medicaid patients also have higher levels of comorbid conditions, thus making them more susceptible to hospital readmissions.

58.     Reducing reimbursements for ER encounters and readmissions for Medicaid patients will impair hospitals' and physicians' ability to provide quality care to already medically-underserved communities.

59.     The Readmission Provision is effectively a penalty assessed against hospitals for providing services to Medicaid patients.

60.     By taking resources disproportionately from hospitals and physicians that predominantly serve the Medicaid population, the Budget Items will exacerbate racial, ethnic, and geographic disparities in medical care.

61.     Forcing hospitals and physician practices to bear the costs of "avoidable" ER visits and "potentially preventable" readmissions for Medicaid patients is to foist the cost of systemic problems with the American healthcare system and population health on those hospitals and practices.

62.     The cost of these systemic problems with the American healthcare system should be borne by the public as a whole.

**C.     Medicaid reimbursements**

63.     Virginia health care providers who treat Medicaid beneficiaries are reimbursed for their services by MCOs (in managed care Medicaid) or the state (in fee-for-service Medicaid) using to the American Medical Association's "current procedural terminology" coding system, known as the CPT system.

64.     The CPT system is a uniform coding system used to identify, describe, and code medical, surgical, and diagnostic services performed by practicing physicians. It is

"the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs." *Newport News Shipbuilding & Dry Dock Co. v. Loxley*, 934 F.2d 511, 513 n.2 (4th Cir. 1991).

65.     According to CPT system coding rules, every health care procedure or service is assigned five-digit code corresponding to a description of the service furnished.

66.     DMAS sets a reimbursement rate for each CPT code that is used to determine payment for physician services. DMAS also uses these CPT codes to establish the reimbursement rate for payment to hospitals through a grouper methodology known as the Enhanced Ambulatory Patient Grouping (EAPG).

67.     The CPT code system uses five codes to describe visits by patients to hospital ERs: 99281, 99282, 99283, 99284, and 99285. These codes correspond to substantively different (and progressively more complex and intensive) services:

(a.)     Code 99281 is for an emergency department visit with these three key components: a problem focused history; a problem focused examination; and straightforward medical decision making. An example would be a visit by a patient with "several uncomplicated insect bites." *See* Am. Med. Ass'n, *2020 CPT Professional Edition* at 845-46.

(b.)     Code 99282 is for an emergency department visit with these three key components: an expanded problem focused history; an expanded problem focused examination; and medical decision making of low complexity. An example would be a visit by "a patient with a minor traumatic injury of an extremity with localized pain, swelling, and bruising." *Id.*

(c.)     Code 99283 is for an emergency department visit with these three key components: an expanded problem focused history; an expanded problem focused examination; and medical decision making of moderate complexity. An example would

be a visit by a young adult patient who sustained a blunt head injury with local swelling and bruising but no confusion, loss of consciousness, or memory loss. *Id.*

(d.)    Code 99284 is for an emergency department visit with these three key components: a detailed history; a detailed examination; and medical decision making of moderate complexity. Examples would be a visit by a patient with a head injury resulting in loss of consciousness or a patient with blood in his or her urine. *Id.*

(e.)    Code 99285 is for an emergency department visit with these three key components within the constraints imposed by the urgency of the patient's clinical condition or mental status: a comprehensive history; a comprehensive examination; and medical decision making of high complexity. An example would be a visit by a "patient who is injured in an automobile accident and is brought to the emergency department immobilized and has symptoms compatible with intra-abdominal injuries or multiple extremity injuries." *Id.*

68.    Thus, code 99285 denotes the most complex emergency department encounters, and 99281 the least complex. *See U.S. ex rel. Trim v. McKean*, 31 F. Supp. 2d 1308, 1310 (W.D. Okla. 1998).

69.    Every acute care hospital in the Commonwealth participates in Medicare.

70.    It is not practical for an acute care hospital to decline to participate in Medicare. In 2018, there were more than 1.5 million Medicare beneficiaries in Virginia (Kaiser Family Found., *Total Number of Medicare Beneficiaries* (2018), perma.cc/6J86-USF6), which is approximately 18% of the Commonwealth's population. No Virginia hospital could survive financially if it did not enroll in Medicare.

71.    All public and nonprofit hospitals and healthcare facilities receive financial assistance under Titles VI and XVI of the Public Health Service Act and are thus required by law to enroll in Medicare and Medicaid. *See* DHHS, *Medical Treatment in Hill-Burton Funded Healthcare Facilities*, perma.cc/9STY-N8HS.

72.     According to DMAS data, there are 73 general acute care hospitals in Virginia to which the Budget Items might apply. Of those 73 hospitals, 54 (74%) are public or nonprofit hospitals that are required to enroll in Medicare.

73.     Under the Emergency Medical Treatment and Active Labor Act (EMTALA), all hospitals participating in Medicare must provide a medical screening examination to any and all patients who present in a hospital's emergency department and requests care. 42 U.S.C. § 1395dd(a). If a patient has an emergency medical condition, the hospital must provide any treatment required to stabilize the condition. *Id.* § 1395dd-(b)(1)(A). These requirements apply regardless of the patient's ability to pay, and a hospital may not inquire about the patient's ability to pay before providing screening or treatment. *Id.* § 1395dd(h).

74.     Medicaid MCOs must also pay for emergency services, defined as medical treatment in an ER required to evaluate or stabilize an emergency medical condition. 42 U.S.C. § 1396u-2(b)(2).

75.     In defining what constitutes an "emergency medical condition" for purposes of Medicaid coverage, Congress employed the "prudent layperson" standard, which defines an emergency medical condition as "a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in—(i) placing the health of the individual (or, with respect to a pregnant woman, the health of the woman or her unborn child) in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part." 42 U.S.C. § 1396u-2(b)(2)(C).

76.     This standard defines a covered emergency medical condition in terms of the *symptoms* that cause a patient to present in the ER, and not in terms of the patient's final *diagnosis*.

77.     If the patient's symptoms are ones that would cause a prudent layperson to believe that there is a medical emergency (*e.g.*, severe chest pain), the patient's condition is covered even if the ultimate diagnosis is not an emergency condition (*e.g.*, heartburn). *See* Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 Fed. Reg. 27,498, 27,749 (May 6, 2016) (explaining that under the prudent-layperson standard, "[t]he final determination of coverage and payment" for emergency services "must be made taking into account the presenting symptoms rather than the final diagnosis").

78.     CMS regulations expressly prohibit MCOs from denying payment for emergency medical conditions as defined by the prudent layperson standard, "including cases in which the absence of immediate medical attention would not have had [one of] the [three] outcomes specified" in the definition. 42 C.F.R. § 438.114(c)(1)(ii)(A). Similarly, an MCO may not "[l]imit what constitutes an emergency medical condition . . . on the basis of lists of diagnoses or symptoms." *Id.* § 438.114(d)(1)(i).

79.     The federal government has emphasized to state Medicaid directors that the federal prudent layperson standard restricts states' and MCOs' ability to deny or modify payments for emergency medical services. For example, CMS has stated that "[w]henever a payer (whether an MCO or a State) denies coverage or modifies a claim for payment, the determination of whether the prudent layperson standard has been met must be based on all pertinent documentation, must be focused on the presenting symptoms (and not on the final diagnosis), and must take into account that the decision to seek emergency services was made by a prudent layperson (rather than a medical professional)." Letter from Timothy M. Westmoreland to State Medicaid Directors 2 (Apr. 18, 2000), perma.cc/DS35-VRED.

### D. The disproportionate burdens of the Budget Items on Virginia hospitals and independent emergency practices

80. The Budget Items impose a massive new financial burden on Virginia general acute-care hospitals and physician practices. Many of these hospitals and physician practices, which have been providing care on the front lines of the COVID-19 pandemic for months, cannot afford these new financial burdens. The Budget Items place these providers' ability to furnish care to Medicaid beneficiaries and other patient populations in immediate jeopardy.

81. The Downcoding Provision penalizes hospitals and physicians by instructing MCOs to downcode ER encounters billed using codes 99282, 99283, and 99284 to the lowest-complexity code (99281) when the visit is deemed "preventable" or "avoidable." A similar downcoding adjustment would apply to the EAPG weights used for reimbursement to the hospital. As a result of this downcoding, hospitals and physicians will be paid at the lowest possible rate even when they have provided high-complexity services to patients.

82. For example, if the visit is deemed "preventable" or "avoidable" after the fact, a physician providing complex services to a patient presenting with blood in his urine will be reimbursed as though she had provided basic services to a patient presenting with a few simple bug bites. She will be reimbursed, in other words, as though she did not provide the services that she actually did.

83. Hospitals and physicians have no way to avoid this financial penalty. As discussed above, EMTALA requires a hospital emergency department and emergency department physicians to treat *every* patient who presents in the ER; hospitals and physicians have no ability to turn away patients whose visits to the ER are "avoidable." Nor can hospitals choose to provide only low-complexity level 1 services to these patients; hospitals' duty is to provide whatever service the patient's presenting symptoms

warrant, be it a brief level 1 evaluation for a minor injury or a lengthier level 4 encounter requiring a physician to perform and interpret multiple diagnostic tests. Thus, the Downcoding Provision will not reduce the costs to the healthcare system of unnecessary ER visits by Medicaid beneficiaries. Rather, it will simply shift the costs of these visits to the hospitals and physician practices that are required to treat these patients, by reimbursing them for less than the value of the services they provide.

84. It is inequitable and unfair to confiscate earned reimbursements from physicians and hospitals who treat Medicaid beneficiaries (as EMTALA requires) presenting in the ER with conditions that are later characterized as "avoidable."

85. Moreover, penalizing hospitals and physician practices with lower reimbursements will not alleviate the problems that the Budget Items purport to address.

86. CMS has advanced a number of interventions that may reduce ER use by Medicaid beneficiaries. These include expanding care options outside hospitals (such as primary care medical homes and urgent care clinics), community interventions for "super-utilizers," and case management programs targeted to the needs of individuals with mental health or substance abuse issues. CMS Bulletin 2-4. MCOs have a contractual duty to provide their members with these care options, particularly adequate primary care.

87. Once a patient has presented in the ER, however, it is too late to treat the patient in a non-emergency setting. It is inappropriate and unlawful to refuse to compensate hospitals and physicians for meeting their obligation under EMTALA to provide care in these circumstances.

88. Medicaid reimbursements already routinely compensate hospitals and doctors significantly below their actual costs. Data from the American Hospital Association show that Medicare and Medicaid together reimburse hospitals about 87 cents for every dollar they spend caring for Medicare and Medicaid beneficiaries. *See* Jacqueline

LaPointe, *Medicare, Medicaid Reimbursement $76.8B Under Hospital Costs*, Revcycle Intelligence (Jan. 7, 2019), perma.cc/WTN8-HT6J.

89.     The Downcoding Provision will have a disproportionate impact on minority communities. At three of the hospitals most significantly impacted by the Downcoding Provision, the proportion of black patients is 92%, 77%, and 72% respectively, based on a retrospective analysis of hospital ER billing information in VHHA's records.

90.     Minority communities have been hit disproportionately hard by the COVID-19 pandemic. The CDC reports that "[l]ong-standing systemic health and social inequities" have put racial and ethnic minority groups at increased risk of contracting COVID-19. CDC, COVID-19 in Racial and Ethnic Minority Groups, perma.cc/JY2C-WYD8. Non-Hispanic black persons, in particular, have a rate approximately 5 times that of non-Hispanic white persons. *Id*.

91.     The Readmission Provision, similarly takes earned reimbursements from hospitals, by instructing MCOs to reimburse hospitals at half the normal reimbursement rate for "potentially preventable" readmissions, even though hospitals have furnished items and services of greater value during these readmissions.

92.     As with the Downcoding Provision, the problem that the Readmission Provision purports to address—high rates of hospital readmission among Medicaid beneficiaries—is not one that hospitals or physicians are responsible for, nor is it one that they are positioned to solve.

93.     In an emergency setting, the role of a hospital or physician is to screen and stabilize a patient's condition and treat the patient until the condition improves enough to permit discharge.

94.     Once a patient is discharged from a hospital, whether the patient's condition soon thereafter requires readmission depends on numerous factors entirely outside the hospital's or physician's control.

95.     These factors include whether the patient can afford and access medication; whether the patient receives proper support services; and whether the patient has access to appropriate primary care for follow-up appointments and ongoing treatment. Although MCOs have the ability and the contractual duty to coordinate care to meet these patient needs, hospitals and physicians have little control over them.

96.     To force hospitals and physicians to bear the costs of "potentially preventable" readmissions is to foist the cost of systemic problems with the American healthcare system and population health on those hospitals and physician practices.

97.     Shifting the bulk of the cost of readmissions onto hospitals and physician practices will make the problem of readmissions of Medicaid beneficiaries *worse*. The Readmission Provision decreases MCOs' and DMAS's incentive to provide appropriate care after beneficiaries are discharged from the hospital—increasing the likelihood that those individuals will end up being readmitted.

98.     The financial impact of these Budget Items on Virginia hospitals and physician practices will be massive. The state calculates that in fiscal year 2021 alone, the two measures will reduce Medicaid reimbursements to Plaintiffs' members by over $55 million. 36 Va. Reg. Regs. at 2326. The expected reduction from the Downcoding Provision will be $40,441,596 in fiscal year 2021 and $14,786,952 for the Readmission Provision in fiscal year 2021. *See* DMAS, *Intent to Amend the State Plan—Avoidable ER Claims and Hospital Readmissions* (May 20, 2020), perma.cc/272V-WY54.

99.     Those takings will come directly out of hospitals' and physician practices' revenues, making many operations financially unsustainable and diverting resources away from patient care.

100.    Both Budget Items are, in practical effect, penalties assessed against hospitals and physician practices for serving Medicaid patients.

101.    Hospitals' already thin margins have been stretched to the breaking point by COVID-19. In March alone, the median operating margin at U.S. hospitals plummeted from 4% to *negative* 8%. Kaufman Hall, National Hospital Flash Report (Apr. 2020), perma.cc/A7FC-UGNS.

102.    Hospitals and physician practices will be immediately unable to hire needed staff, acquire new equipment, or service and maintain existing equipment and facilities because of the Budget Items. As a result, quality of care will decline immediately, and hospitals' and physicians' reputations will suffer irreparable harm.

103.    The pandemic has increased hospitals' and physician practices' costs, requiring hospitals to implement new infection controls, scramble to purchase personal protective equipment quickly, and add beds on an emergency basis to ensure adequate capacity to treat COVID-19 patients. *See* Va. Exec. Order 52 (Mar. 20, 2020; amended June 22, 2020), perma.cc/8TMT-Y9JB (providing for increases in hospital and nursing home bed capacity during pandemic). Prices for certain medical supplies have "increased exponentially" during the pandemic, and hospitals' labor costs have increased as they retain new staff and pay current employees more overtime. *See* Am. Hosp. Ass'n, *Hospitals and Health Systems Face Unprecedented Financial Pressures Due to COVID-19* at 3 (May 2020), perma.cc/F6W4-RH4D.

104.    In all, VHHA members have expended approximately $218 million to develop and staff adequate hospital surge capacity in the Commonwealth, purchase additional supplies of personal protective equipment, establish new testing capabilities, and take other measures to prepare and respond to the COVID-19 pandemic.

105.    At the same time, hospitals in Virginia have seen their revenues decline sharply due to the pandemic, as fear of COVID-19 caused patients to defer or cancel medical treatment and as hospitals and physicians were ordered to defer or cancel non-essential medical treatments and procedures. See Order of Public Health Emergency

Two (March 25, 2020; amended April 23, 2020) (prohibiting procedures and surgeries that require personal protective equipment). Based upon information provided by its members, VHHA estimates that hospitals in Virginia have lost approximately $25 million in net revenue each day or $750 million per month in the height of the pandemic. Revenue losses for the months March through June 2020 exceed $1 billion. This decline means "steep reductions in revenue for all hospitals and health systems across the country," including in Virginia. Am. Hosp. Ass'n, supra, at 2.

106.    Virginia's hospitals and physicians are striving to provide the highest quality of care to Virginians despite these challenges. But with COVID-19 continuing to impact communities throughout the state, now is not the time to impose even more financial burdens on providers—particularly when there is little that hospitals can do to mitigate or avoid those burdens.

### CLAIMS FOR RELIEF

### COUNT I
### declaratory and injunctive relief based on
### unconstitutional taking

107.    Plaintiffs incorporate and adopt by reference all of the foregoing paragraphs as though alleged herein.

108.    The Budget Items violate the Takings Clause of the Fifth Amendment, which prohibits the government from taking "private property" "for public use, without just compensation." U.S. Const. amend. V.

109.    It is a violation of the Takings Clause for a state to take the economic value of hospitals' and doctors' services and supplies for the public's own use and benefit without paying just compensation, as the Budget Items here do.

110.    The Supreme Court has interpreted the Takings Clause to apply not only to physical takings of property but also to "regulatory" takings—*i.e.*, regulations that

have the practical effect of seizing economic value from private parties for public use, such that fairness requires paying them compensation.

111. The economic impact of the Budget Items on Virginia hospitals and physician practices will be substantial: DMAS estimates that the Budget Items will confiscate more than $55 million per year from Virginia hospitals and physician practices.

112. The Budget Items will interfere with hospitals' and physician practices' investment-backed expectation that they will be paid for the actual services and resources they provide to patients.

113. Under Medicaid payment procedures, health care providers receive higher compensation for providing more complex services. Hospitals and physician practices rely on these principles of fee-for-service billing when they set their budgets and make investments in their facilities, including emergency facilities. Hospitals and physician practices estimate the volume of each kind of medical service that they expect to provide, including to Medicaid beneficiaries, and use the payment rates for each service to derive estimates of the revenue that they expect to earn.

114. The Budget Items upset the reliance interests of hospitals and physician practices on settled billing practices. Under the Downcoding Provision, a hospital or physician practice that has a level 4 ER encounter, billed using code 99284, will be paid as though it were a level 1 encounter, billed using code 99281 (with similar reductions applied to the EAPG payment weight), if the encounter is deemed "avoidable" after the fact.

115. There is a significant difference in the services provided and the resources expended between a level 4 ER encounter, billed using code 99284, and a level 1 encounter, billed using code 99281. Pursuant to EMTALA and the Downcoding Provision, DMAS is compulsorily taking the actually-provided difference between those services for public use without just compensation.

116.    Similarly, under the Readmission Provision a hospital will receive just 50% of the customary claim reimbursement rate for a readmission encounter that is "potentially preventable." This, too, is a taking: DMAS is appropriating physician services and hospital resources for public purposes without just compensation.

117.    The Readmission Provision upsets hospitals' investment-backed expectations by, among other things, dramatically reducing the financial sustainability of operating their hospital facilities.

118.    Both Budget Items are forcing hospitals and physician practices alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole, by shifting the cost of systemic health care issues onto these providers.

119.    The problems that the Budget Provisions purport to address—*i.e.*, overuse of ERs and hospital resources by Medicaid beneficiaries—are beyond the control of the hospitals and physician practices that treat these individuals. Rather, these problems arise from structural flaws in the American health care system, including inadequate access to primary care for socioeconomically challenged populations and insufficient outpatient support for those with chronic medical issues or behavioral health or substance abuse problems.

120.    Unnecessary ER use has multiple, complex causes that have economic, social, and political dimensions. Yet the Budget Items single out hospitals and physician practices—the front-line doctors and hospital nurses and other employees who are working hard every day to serve vulnerable populations and who are least to blame for these systemic problems—and force them to bear the cost themselves.

121.    By virtue of the foregoing, enforcement of Budget Items 313.AAAAA and 313.BBBBB against Plaintiffs' members violates the Takings Clause of the United States Constitution and will cause irreparable harm for which Plaintiffs' members have no adequate remedy at law.

**COUNT II**
**declaratory relief and injunction based on**
**preemption under 42 U.S.C. § 1396a(a)(30)(A)**

122.   Plaintiffs incorporate and adopt by reference all of the foregoing paragraphs as though alleged herein.

123.   The Budget Items are preempted by, violations of, and unenforceable under 42 U.S.C. § 1396a(a)(30)(A).

124.   Section 1396a(a) provides in relevant part that "A State plan for medical assistance must— . . . (30)(A) provide such methods and procedures relating to . . . the payment for[] care and services . . . as may be necessary . . . to assure that payments are consistent with efficiency, economy, and quality of care."

125.   In *Wilder v. Virginia Hospital Association*, 496 U.S. 498, 512 (1990), the Supreme Court held that 42 U.S.C. § 1396a(a)(13)(A)—which then contained substantively similar language—"imposes a binding obligation on States participating in the Medicaid program to adopt reasonable and adequate rates," giving rise to a right that "is enforceable under § 1983 by health care providers."

126.   Under Budget Items 313.AAAAA and 313.BBBBB, Virginia's plan for Medicaid reimbursements

(a.)   denies health care providers payments necessary to ensure efficiency, economy, and quality of care for Medicaid patients;

(b.)   denies health care providers payments that are reasonable and adequate to meet the costs incurred by efficiently and economically operated health care facilities with respect to Medicaid patients presenting in emergency departments or being readmitted to hospitals; and

(c.)   will adversely affect the quality of care received by Medicaid patients presenting in emergency departments or being readmitted to hospitals.

24

127.   By virtue of the foregoing, enforcement of Budget Items 313.AAAAA and 313.BBBBB against Plaintiffs' members is preempted by 42 U.S.C. § 1396a(a)(30)(A) and will cause irreparable harm for which Plaintiffs' members have no adequate remedy at law.

### COUNT III
### declaratory relief and injunction based on
### preemption under 42 U.S.C. § 1396u-2(b)(2) and 42 C.F.R. § 438.114(c)(1)

128.   Plaintiffs incorporate and adopt by reference all of the foregoing paragraphs as though alleged herein.

129.   MCOs and DMAS cannot comply with both federal law and the Downcoding Provision.

130.   The Medicaid Act requires every contract between a state Medicaid agency and an MCO to require the MCO to "provide coverage for emergency services . . . without regard to prior authorization or the emergency care provider's contractual relationship with the organization or manager." 42 U.S.C. § 1396u-2(b)(2)(A)(i).

131.   "Emergency services" are defined as services that evaluate or stabilize an "emergency medical condition," as determined by the prudent-layperson standard. *Id.* § 1396u-2(b)(2)(B)-(C).

132.   MCOs must pay for emergency services using the "prudent layperson" standard, which defines an emergency medical condition in terms of the *symptoms* that cause a patient to present in the ER, not the patient's final *diagnosis*. *See* 42 U.S.C. § 1396u-2(b)(2)(C); *see also* Medicaid and Children's Health Insurance Program (CHIP) Programs; Medicaid Managed Care, CHIP Delivered in Managed Care, and Revisions Related to Third Party Liability, 81 Fed. Reg. 27,498, 27,749 (May 6, 2016) (explaining that under the prudent-layperson standard, "[t]he final determination of coverage and payment" for emergency services "must be made taking into account the presenting symptoms rather than the final diagnosis").

133.    Thus, the Medicaid statute requires MCOs and DMAS to provide coverage for all emergency services as long as a prudent layperson would have believed there was a medical emergency based on the patient's presenting symptoms—even if the patient's final diagnosis is not an emergent condition.

134.    CMS's regulations impose the same requirement, stating that MCOs must "cover and pay for emergency services," defined by the prudent-layperson standard. 42 C.F.R. § 438.114(c)(1)(i); *accord id.* § 438.114(d)(1)(i) (MCOs may not "[l]imit what constitutes an emergency medical condition" based on "diagnoses or symptoms").

135.    CMS regulations prohibit MCOs and DMAS from limiting what constitutes an emergency medical condition on the basis of diagnosis. 42 C.F.R. § 438.114-(d)(1)(i).

136.    The Downcoding Provision conflicts with these federal-law requirements and is therefore preempted by them. It provides that when an ER encounter billed using codes 99282, 99283, or 99284 is deemed "preventable" or "avoidable" based on final diagnosis, the MCO shall not reimburse for the services actually listed. Instead, the MCO "shall" downcode the visit to 99281, which covers different services. 2020 Va. Acts ch. 1289, at 369.

137.    The Downcoding Provision conflicts with and stands as an obstacle to the achievement of Congress's goals in 42 U.S.C. § 1396u-2(b)(2)(A)(i) and reflected in 42 C.F.R. § 438.114(c)(1)(i).

138.    Congress enacted the prudent-layperson standard to ensure that patients could access the ER when they believed an emergency was occurring by promising that providers would be paid for those visits.

139.    The Downcoding Provision is preempted by the Medicaid Act, 42 U.S.C. § 1396u-2(b)(2), and CMS's regulations, 42 C.F.R. § 438.114, because it directs MCOs to deny Plaintiffs' members full payment for emergency medical services provided in cir-

cumstances where federal law and the prudent-layperson standard require full coverage for those services.

140.    By virtue of the foregoing, enforcement of the Downcoding Item against Plaintiffs' members is preempted by 42 U.S.C. § 1396u-2(b)(2) and 42 C.F.R. § 438.114 and will cause irreparable harm for which Plaintiffs' members have no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and:

1.    declare that the Budget Items violate the Takings Clause and that DMAS accordingly may not implement or enforce them,

2.    declare that the Budget Items are preempted by the Medicaid statute and implementing regulations and that DMAS accordingly may not implement or enforce them,

3.    preliminarily and permanently enjoin Defendant from implementing or enforcing the Budget Items, and

4.    award Plaintiffs such other and further relief as the Court may deem just and proper.

Dated: July 30, 2020                            Respectfully submitted,

*/s/ Katherine Ruffing*

MICHAEL B. KIMBERLY*
MATTHEW A. WARING* (Va. Bar # 85669)
KATHERINE RUFFING (Va. Bar # 79006)
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*
   *mkimberly@mwe.com*
   *mwaring@mwe.com*
   *kruffing@mwe.com*

*Attorneys for Plaintiffs*

* *pro hac vice* motion forthcoming

## VERIFICATION

     I, R. Brent Rawlings, hereby verify that I am Senior Vice President and General Counsel of the Virginia Hospital & Healthcare Association (VHHA) and have authority and personal knowledge to verify this Verified Complaint on behalf of VHHA. I have read the foregoing Verified Complaint and affirm that I believe that the facts averred are true and correct, to the best of my knowledge, information, and belief.

I verify under penalty of perjury that the foregoing is true and correct.

Executed on July **30**, 2020.

R. Brent Rawlings