IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
**Richmond Division**

VIRGINIA HOSPITAL       )
HEALTHCARE ASSOCIATION, *et al.*,  )
           )
      Plaintiffs,       )
           )
v.            )    Civil Action No. 3:20-cv-587–HEH
           )
CHERYL ROBERTS, in her official   )
capacity as Director of the Virginia   )
Department of Medical Assistance   )
Services, *et al.*,        )
           )
      Defendants.   )

<u>**MEMORANDUM OPINION**</u>
**(Resolving Motions and Closing the Case)**

This case involves the Virginia General Assembly's approval of Budget Item

313.AAAAA (the "Downcoding Provision") on April 22, 2020.  Submitted in response to

the COVID-19 pandemic, the Downcoding Provision was designed to limit costs

associated with Medicaid and Medicare patients' overuse of hospital emergency rooms

("ER") for situations that Virginia's Department of Medical Assistance Services

("DMAS") concluded were avoidable ER visits.  The Downcoding Provision attempts to

achieve this effect by downcoding or capping the reimbursement rates that healthcare

providers can receive for certain services they provide to covered patients if the final

diagnosis that the patient receives is found on a list of avoidable emergency diagnoses.

Plaintiffs in this case are Virginia Hospital & Healthcare Association ("VHHA"),

The Medical Society of Virginia ("MSV"), and Virginia College of Emergency

Physicians ("VACEP") (collectively, "Plaintiffs"). They argue that the Downcoding

Provision's denial of payment for services already rendered is impliedly preempted by

federal law, a violation of the Administrative Procedures Act ("APA"), constitutes a *per

se* taking without just compensation in violation of the Fifth Amendment to the U.S.

Constitution, and they seek to permanently enjoin Defendants from implementing or

enforcing the provision.

Defendants in this case are lead officials who represent either Virginia or federal

government agencies tasked with overseeing Medicaid and Medicare services and

regulations. The only Virginia state Defendant, Cheryl Roberts, is being sued in her

official capacity as Interim Director of DMAS.[1] The remaining federal Defendants are

Secretary Xavier Beccerra, in his official capacity as Secretary of the U.S. Department of

Health and Human Services, and Chiquita Brooks-Lasure, in her official capacity as

Administrator of the Centers of Medicare & Medicaid Services (collectively, "CMS" or

"federal Defendants"). Defendants argue that the state and federal agencies were within

their lawful authority to approve and implement the Downcoding Provision and that the

capping of reimbursement rates does not violate the Takings Clause of the Fifth

Amendment.

This matter is presently before the Court on DMAS' Motion to Dismiss ("DMAS'

Motion," ECF No. 57), filed on October 6, 2022, and the Plaintiffs' and CMS' Cross-

---

[1] For ease of reference, the Court will refer to this party as "DMAS" or "state Defendant."

Motions for Summary Judgment (ECF Nos. 52, 54), filed on September 6, 2022, and October 6, 2022, respectively.  All parties have submitted extensive memoranda supporting their respective positions, and oral argument was heard on February 7, 2023. For the following reasons, DMAS' Motion to Dismiss will be converted to a Motion for Summary Judgment and will be granted.  Plaintiffs' Motion for Summary Judgment will be granted in part and denied in part, and Defendants' Motion for Summary Judgment will be granted in part and denied in part.

## I.   BACKGROUND

As a threshold matter, courts generally may not consider materials outside the complaint in ruling on a motion to dismiss without converting the motion to one for summary judgment.  *See* Fed. R. Civ. P. 12(d); *see also Hickey v. Bon Secours Richmond Health Sys.*, No. 3:12CV691, 2012 WL 6623039, at *2 (E.D. Va. Dec. 19, 2012) (explaining courts generally cannot consider extraneous materials on motion to dismiss without converting to motion for summary judgment).  It is well settled that district courts may convert a Rule 12(b)(6) motion to dismiss into a Rule 56 motion for summary judgment, allowing them to assess whether genuine issues of material fact exist.  *See, e.g., George v. Kay*, 632 F.2d 1103, 1106 (4th Cir. 1980); *see also* 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1366, at 159–65 & n.17 (3d ed. 2004) (listing multiple cases from every circuit recognizing the district court's discretionary power to convert a Rule 12(b)(6) motion to a Rule 56 motion).

Federal Rule of Civil Procedure 12(d) states: "[i]f, on a motion under 12(b)(6) or

3

12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." In considering whether conversion is appropriate, the district court must consider whether the parties had adequate notice and "a reasonable opportunity to present all material made pertinent to such a motion by Rule 56." *Finley Lines Joint Protective Bd. Unit 200, Bhd. Ry. Carmen v. Norfolk S. Corp.*, 109 F.3d 993, 996 (4th Cir. 1997). "Where plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint the necessity of translating a Rule 12(b)(6) motion into one under Rule 56 is largely dissipated." *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (4th Cir. 1991).

Here, both DMAS and Plaintiffs had ample opportunity to present relevant materials regarding each of their motions. Extensive briefing was submitted in support of and opposition to the issues raised in both motions, and all parties had a reasonable opportunity to present all pertinent materials to this case. Additionally, on February 7, 2023, this Court heard oral argument on all pending motions at which time all parties presented argument. Given the development of the record and extensive briefing, this Court concludes that DMAS' Motion should appropriately be converted into a motion for summary judgment, and the Court will consider it as such.

In reviewing cross-motions for summary judgment, the Court must consider each motion separately on its own merits to determine if either party deserves judgment as a matter of law. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (citations

4

omitted).  In considering each motion, the Court will resolve any factual disputes and "competing, rational inferences" in the light most favorable to the opposing party.  *Id.* (internal quotation marks and citation omitted).  The following narrative represents the undisputed facts for the purpose of resolving the cross-motions for summary judgment.

## A. The Medicaid Program

"Medicaid is the nation's public health insurance program for those of limited means."  *Planned Parenthood S. Atl. v. Baker*, 941 F.3d 687, 691 (4th Cir. 2019).  It provides health insurance coverage to low-income children and their families, the elderly, pregnant women below a certain income level, and the disabled.  *Id.*; *see also* 42 U.S.C. § 1396a.

Unlike Medicare, which is administered exclusively by the federal government, "the Medicaid program functions as a partnership between the federal government and the states."  *Maryland Dep't of Health & Mental Hygiene v. CMS*, 542 F.3d 424, 429 (4th Cir. 2008).  CMS is the federal agency within the Department of Health and Human Services that administers the Medicare program and works in partnership with state governments to administer Medicaid.  The federal government provides federal financial assistance to each state for the costs incurred by that state for patient care.  In return, the state must pay its share of the costs and comply with the Medicaid statute and any administrative regulations promulgated by CMS.  *See Baker*, 941 F.3d at 691.

States propose and submit "plans" for approval by CMS, which reviews the plans to ensure they "conform[] to the requirements of approval."  42 U.S.C. § 1396a(a)(1); *see*

5

*also id.* § 1396a(b); 42 C.F.R. § 430.10. Amendments to these plans, referred to as State Plan Amendments ("SPAs"), must likewise be submitted to CMS, and CMS must "determine whether the plan continues to meet the requirements for approval." 42 C.F.R. § 430.12(c)(2)(i). If a state's plan or SPA is inconsistent with federal requirements, those inconsistencies can be grounds for CMS to deny approval or withhold Medicaid funding in whole or in part. 42 U.S.C. §§ 1396a(b), 1396c.

Virginia, like every other state and commonwealth, participates in Medicaid. Its state Medicaid program is administered by DMAS. *See* 12 V.A.C. §§ 30-10-10, 30-20-10. DMAS does so through both a traditional fee-for-service program and a managed care program. *See* 12 V.A.C. §§ 30-12-370, 30-120-610. Under the fee-for-service Medicaid program, beneficiaries seek services directly from providers, who are then paid directly by DMAS. Under the managed care program, DMAS contracts with various managed care organizations ("MCOs"), which in turn provide medical services to beneficiaries by contracting with a network of physicians, hospitals, and other healthcare providers. Most Virginia Medicaid beneficiaries receive coverage through an MCO.

"Emergency Services" are defined as inpatient and outpatient services that "are needed to evaluate or stabilize an emergency medical condition." 42 U.S.C. § 1396u-2(b)(2)(B). Under § 1396u-2(b)(2), every state's Medicaid program must "provide coverage for emergency services . . . without regard to prior authorization or the emergency care provider's contractual relationship with" an MCO. *Id.* § 1396u-2(b)(2)(A)(i); *see also* 42 C.F.R. § 438.114 (MCOs and the state "are responsible for

6

coverage and payment of emergency services.").

An "emergency medical condition" is defined by the so-called prudent layperson standard. 42 U.S.C. § 1396u-2(b)(2)(C). It is a "medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that a prudent layperson, who possesses an average knowledge of health and medicine, could reasonably expect the absence of immediate medical attention to result in . . . serious jeopardy" to "the health of the individual," "serious impairment to bodily function," or "serious dysfunction of any bodily organ or part." *Id.* Under this standard, the question of what constitutes an "emergency medical condition" is determined by the *symptoms* that cause a patient to seek emergency medical care in the ER, and not by the patient's final *diagnosis.* CMS regulations expressly establish that states or their delegated MCOs may not "[l]imit what constitutes an emergency medical condition . . . on the basis of lists of diagnoses or symptoms." 42 C.F.R. § 438.114(d)(1)(i). They also prohibit states and their MCOs from "deny[ing] payment for treatment obtained" if "[a]n enrollee had an emergency medical condition." *Id.* § 438.114(c)(1)(ii). That requirement applies even when "the absence of immediate medical attention" would not in fact have resulted in serious jeopardy or harm. *Id.*

Additionally, the medical assistance provided to Medicaid beneficiaries "shall not be less in amount, duration, or scope than the medical assistance available to" any other categorically or medically needy individual. 42 U.S.C. § 1396a(a)(10)(B); 42 C.F.R. § 440.240. States must "provide safeguards as may be necessary to assure that . . . care

and services [under that state's plan] will be provided, in a manner consistent with simplicity of administration and the best interests of the recipients." 42 U.S.C. § 1396a(a)(19).

## B. EMTALA

Under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), all hospitals participating in Medicare are legally required to provide screening and stabilization services to all patients who present in a hospital's emergency department with an emergency medical condition. *Id.* §§ 1395dd(a), (b)(1)(A). EMTALA's definition of an "emergency medical condition" incorporates the same prudent layperson standard as appears in the Medicaid Act. *Id.* § 1395dd(e); *see also* § 1396u-2(b). Accordingly, hospitals must screen and stabilize anyone whose symptoms would lead an ordinary individual of average experience and knowledge to believe that emergency medical intervention is required to prevent serious jeopardy or harm. *Id.* In turn, as previously mentioned, states must cover that treatment under the Medicaid Act.

EMTALA's mandated-care requirement is a condition of participation in Medicare, but it applies to *all* ER encounters, regardless of how the patient pays. *Id.* § 1395dd(a), (h). If the hospital participates in Medicare, EMTALA applies and the hospital must provide care to all patients to the ER, regardless of ability to pay or method of payment. *Id.* The consequences for violating EMTALA include not only expulsion from the Medicare program, but also civil penalties of up to $50,000 per violation, exclusion from Medicare and state healthcare programs, and civil damages. *Id.*

8

§ 1395dd(d).

Although EMTALA applies only to hospitals enrolled in Medicare, Plaintiffs argue that every acute care hospital in Virginia is practically compelled to participate in Medicare. (Pls.' Mem. in Supp. at 5, ECF No. 53.)  Consequently, they allege that all acute care hospitals are mandatorily subject to EMTALA and are required to provide the emergency care services mandated by the statute.  (*See* Am. Compl. ¶ 39, ECF No. 41.)

Plaintiffs argue these hospitals are virtually compelled to participate in EMTALA for two reasons.  First, hospitals must participate in Medicare under Virginia's "certificate of public need" ("COPN") program.  *See* Va. Code Ann. § 32.1-102.1:3(B). Virginia's COPN program mandates that all hospitals and healthcare systems seeking to build a new medical facility; increase, relocate, or convert hospitals beds; add nursing home services; introduce new medical imaging facilities, including CT and MRI machines; or undertake any other capital expenditure of $15 million or more must first obtain a COPN from Virginia's Commission of Health.  *Id.*  All such certificates are conditioned on the applicant's agreement to provide care to all Medicare and Medicaid patients.  *Id.* § 32.1-102.4(B).

Second, 54 of Virginia's 73 general acute care hospitals are public or nonprofit hospitals.  (Am. Compl. ¶ 40.)  Plaintiffs contend these hospitals, as recipients of federal financial assistance under Titles VI and XVI of the Public Health Service Act, are again legally required to enroll in Medicare and Medicaid.  *Id.*; DHHS, *Medical Treatment in Hill-Burton Funded Healthcare Facilities*, https://perma.cc/9STY-N8HS (last visited

Apr. 21, 2023). Many of Virginia's public hospitals are also required by their charters—

which Plaintiffs assert are approved and promulgated by the Virginia General

Assembly—to participate in Medicare. (*See, e.g.*, McDonnell Decl. ¶ 10, ECF No. 10-

10.)

In addition, Plaintiffs allege that basically no hospital in Virginia would be able to

financially survive without participating in Medicare. (Am. Compl. ¶ 39.) If a hospital

is not enrolled in Medicare, it will not receive payment for treating Medicare patients.

*See* 42 C.F.R. § 424.505 ("To receive payment for covered Medicare items or services . .

., a provider or supplier must be enrolled in the Medicare program.") In April 2022,

around 1.6 million Virginians were enrolled in Medicare. CMS, *Medicare Monthly*

*Enrollment* (Apr. 2022), https://perma.cc/PVB3-SF4V.

In sum, Plaintiffs believe that the compulsion created by these requirements is

practically unavoidable, and as such, the hospitals have no real choice in being subject to

EMTALA's mandates.

## C. Medicaid Payments and CPT Codes

Virginia healthcare providers who treat Medicaid beneficiaries receive

reimbursements from MCOs (in managed care Medicaid) or DMAS (in fee-for-service

Medicaid) using the American Medical Association's ("AMA") "current procedural

terminology" ("CPT") system. *See* DMAS, *Procedure Fee Files & CPT Codes*,

https://perma.cc/LQT2-FHTK (last visited Apr. 21, 2023).

The CPT system uses a set of codes and descriptions developed and maintained by

10

the AMA to identify and describe medical, surgical, and diagnostic services performed by physicians. *Hooper v. United Healthcare Ins. Co.*, 694 F. App'x 902, 909 (4th Cir. 2017). The CPT system is "the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs." *Newport News Shipbuilding & Dry Dock Co. v. Loxley*, 934 F.2d 511, 513 n.2 (4th Cir. 1991); *see also* 45 C.F.R. § 162.1002 (adopting CPT as one of the standard medical data code sets for healthcare services). Under the CPT system, every healthcare procedure or service is assigned a five-digit code corresponding to a description of the service furnished. *See* AMA, *CPT Overview and Code Approval*, https://www.ama-assn.org/practice-management/cpt/cpt-overview-and-code-approval (last visited Apr. 23, 2023).

DMAS, like other state Medicaid authorities, sets a payment rate for each CPT code to determine payment for physician services. 12 V.A.C. § 30-80-190 (reimbursement for fee-for-service providers based on CMS' resource-based value scale). The CPT code system uses five codes to describe visits by patients to hospital ERs: 99281, 99282, 99283, 99284, and 99285. These codes correspond to substantively different—and progressively more complex and intensive—services. Each code describes an ER encounter with the following elements:

- **99281 (level 1):** a problem focused history; a problem focused examination; and straightforward medical decision making. An example would be a visit by a patient with "several uncomplicated bug bites." At the time of this litigation, a

11

doctor's reimbursement for a level 1 ER encounter is around $15.[2]

- **99282 (level 2):** an expanded problem-focused history; an expanded problem focused examination; and medical decision making of low complexity.  An example would be a visit by "a patient with a minor traumatic injury of an extremity with localized pain, swelling, and bruising."  A doctor's reimbursement for a level 2 ER encounter is around $29.

- **99283 (level 3):** an expanded problem-focused history; an expanded problem focused examination; and medical decision making of moderate complexity.  An example would be a visit by a young adult patient who sustained a blunt head injury with local swelling and bruising but no confusion, loss of consciousness, or memory loss.  A doctor's reimbursement for a level 3 ER encounter is around $49.

- **99284 (level 4):** a detailed history; a detailed examination; and medical decision making of moderate complexity.  Examples would be a visit by a patient with a head injury resulting in loss of consciousness or a patient with blood in his or her urine.  A doctor's reimbursement for a level 4 ER encounter is around $82.

- **99285 (level 5):** a comprehensive history; a comprehensive examination; and medical decision making of high complexity.  An example would be a visit by a "patient who is injured in an automobile accident and is brought to the emergency department immobilized and has symptoms compatible with intra-abdominal

---

[2] The prices provided are as listed at the time of the Amended Complaint.

injuries or multiple extremity injuries." A doctor's reimbursement for a level 5

ER encounter is around $120.

(*See* Am. Compl. ¶ 36–37; AMA, *2020 CPT Professional Edition* 845–46 (Sept. 2020)

(encounter descriptions).) Medical services provided in a level 5 encounter require

significantly more professional time and supplies, and lengthier and more extensive

access to medical facilities, than services provided in a level 1 encounter. (Am. Compl.

¶ 37.)

## D. The Downcoding Provision and CMS' Approval of it

On April 22, 2020, the Virginia General Assembly approved a reduced state

budget in response to the COVID-19 pandemic. *See* 2020 Va. Acts ch. 1289. Among the

measures included in the budget was the Downcoding Provision,[3] which requires DMAS

and its MCOs to reimburse genuine level 2, 3, and 4 encounters at the level 1 rate,

depending entirely on whether the encounter culminates in a diagnosis that DMAS

concludes is a "preventable" or "avoidable" ER visit. *Id.* The provision states in full:

> The Department of Medical Assistance Services shall amend the State Plan
> for Medical Assistance Services to allow the pending, reviewing and the
> reducing of fees for avoidable emergency room claims for codes 99282,
> 99283, and 99284, both physician and facility. The department shall utilize
> the avoidable emergency room diagnosis code list currently used for
> Managed Care Organization clinical efficiency rate adjustments. If the
> emergency room claim is identified as a preventable emergency room

---

[3] Many, including Plaintiffs, have characterized the portion of the Virginia state budget approved
by the General Assembly at issue here as "the Downcoding Provision." (Pls.' Mem. in Supp. at
9.) The Court notes that Defendants dispute Plaintiffs' characterization of the budget item in this
way. (CMS' Opp'n at 7, ECF No. 56.) For clarity, the Court will adopt the nomenclature
"Downcoding Provision" only for ease of reference.

diagnosis, the department shall direct the Managed Care Organizations to default to the payment amount for code 99281, commensurate with the acuity of the visit.   The department shall have the authority to implement this reimbursement change effective July 1, 2020, and prior to the completion of any regulatory process undertaken in order to effect such change.

2020 Va. Acts ch. 1289, 313.AAAAA.

The Downcoding Provision's preventable diagnosis list includes nearly 800 diagnoses, including many seemingly obvious emergencies, such as heart failure, ketoacidosis (a serious complication of diabetes that can result in coma or death if not treated immediately), Bell's palsy (loss of muscle control on one side of the face, akin to a stroke), and severe persistent asthma with acute exacerbation.   JA 159–83; *see also* JA 126–53.[4]

DMAS explained that the Downcoding Provision's preventable diagnosis list is "not intended to imply that [patients] did not need or should have been denied access" to the ER but instead only "to reflect the objective that more effective, efficient and innovative managed care could have prevented or preempted the need for some members to seek care in the [ER]."   DMAS, *Clinical Efficiency Performance Measure Technical Specifications* (May 2021).

Plaintiffs argue that hospitals and physicians have no way to avoid application of the Downcoding Provision.   (Pls.' Mem. in Supp. at 10.)   Because EMTALA requires a hospital's ER and its ER physicians to treat every patient who presents in the ER and

---

[4] The Court references the joint appendix filed by the parties in the Fourth Circuit as "JA," and references the administrative record produced by the parties as "AR."

14

satisfies the prudent layperson standard, hospitals and physicians cannot turn away patients whose visits to the ER may be deemed "avoidable." *See* 42 U.S.C. § 1395dd. Due to these requirements, Plaintiffs contend that hospitals cannot choose to provide only low-complexity level 1 services to these patients. (Pls.' Mem. in Supp. at 10.) This is in direct contrast with the fact that a hospital's duty is to provide whatever service the patient's presenting symptoms warrant—"be it a brief level 1 evaluation for a minor injury or a lengthier level 4 encounter requiring a physician to perform and interpret multiple diagnostic tests." (*Id.*) Thus, Plaintiffs assert that the Downcoding Provision does not reduce the costs of Medicaid beneficiaries' overuse of ERs to the healthcare system by influencing physician behavior. (*Id.*) Rather, it simply shifts those costs to the hospitals and physician practices that are required to treat these patients by reimbursing them for less than the value of the services they actually provided. (Am. Compl. ¶¶ 58–60.)[5]

As required by statute, DMAS issued a notice of intent to amend the state Medicaid plan to include the Downcoding Provision in its fee-for-service Medicaid program. *See* 36 Va. Reg. Regs. 2326 (June 8, 2020); AR 1178–81. DMAS separately

---

[5] Plaintiffs admit that CMS has advanced several interventions that may reduce ER use by Medicaid beneficiaries, including expanding care options outside hospitals (such as primary care medical homes and urgent care clinics), community interventions for "super-utilizers," and case management programs targeted to the needs of individuals with mental health or substance abuse issues. Cindy Mann, *CMCI Informational Bulletin: Reducing Nonurgent Use of Emergency Departments and Improving Appropriate Care in Appropriate Settings*, 2–4 (Jan. 16, 2014). However, Plaintiffs argue that once a patient has presented in the ER, it is too late to treat the patient in a non-emergency setting.

directed MCOs' compliance with the provision, and MCOs have complied.  (Pls.' Mem. in Supp. at 11.)

After issuing notice, DMAS submitted its proposed amendment to CMS.  *See* AR 1178–1248.  With the submission, DMAS included a summary of 200 comments submitted by interested parties in response to its initial notice of intent.  *Id.*  Each comment opposed the provision by, among other things, highlighting the provision's incompatibility with the Prudent Layperson Standard and explaining the harsh financial burden it would inflict on hospitals, the threat it would pose to patient health and safety, and the negative effect it would have on care and access to care.  *See* AR 1187–1236. DMAS noted in its submission that "[n]o changes were made as a result of the comments." AR 1244.

After DMAS proposed the amendments, Plaintiffs VHHA, VACEP, and MSV— joined additionally by the Emergency Department Practice Management Association— sent several detailed comments to federal regulators explaining how the proposed amendments violate applicable federal law, regulations, and CMS guidance.  (*See* Letter to Alex Azar, Seema Verma, Vanila Singh (Oct. 22, 2020) AR 164–78; Letter to Rory Howe (Nov. 24, 2020) AR 180–84; Letter to Xavier Bacerra and Chiquita Brooks-Lasure (June 21, 2021) AR 160–162; Letter to Xavier Bacerra and Chiquita Brooks-LaSure (July 13, 2021) AR 157–159; and Letter to Rory Howe (Dec. 17, 2021) AR 25–29.)

Notwithstanding this opposition to the Downcoding Provision, CMS approved Virginia's SPA in a letter dated December 22, 2021.  AR 2–23.  The letter does not

16

address any concerns raised by Plaintiffs or other commenters nor does it provide an explanation as to how the Downcoding Provision harmonizes with federal law. *Id.*

The Downcoding Provision seemingly imposes a substantial financial burden on Virginia doctors, hospitals, and physician practices. JA 36, 43–46, 51, 55, 62, 71, 78, 82. DMAS itself estimates that the annual financial impact of the Downcoding Provision exceeds $40 million. 36 Va. Reg. Regs. at 2326. Plaintiffs contend those savings come directly out of hospitals and physician practices' budgets. (Pls.' Mem. in Supp. at 12.) Consequently, Plaintiffs argue hospitals will likely have less capacity to pay for new equipment, hire or maintain staff, or make other investments in their ability to deliver patient care—all of which necessarily negatively impacts the efficiency and quality of care provided to Medicaid beneficiaries. *See, e.g.,* JA 37, 43–46, 51–52, 56–58, 62–63, 72–73, 77–78, and 82–84. Plaintiffs allege these detrimental effects have been compounded since commencement of this suit by the COVID-19 pandemic, which has produced a marked increase in Medicaid enrollment, from 1.59 million Virginias in mid-2020 to 2.06 million today. *See* DMAS Monthly Enrollment Report, https://perma.cc/38JA-37DC (last visited Apr. 21, 2023).

## II.   STANDARD OF REVIEW

The standard of review for cross-motions for summary judgment is well-settled in the United States Court of Appeals for the Fourth Circuit:

> On cross-motions for summary judgment, a district court should "rule upon each party's motion separately and determine whether summary judgment is appropriate as to each under the [Federal Rule of Civil Procedure] 56

17

standard." Summary judgment is appropriate only if the record shows "there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."

*Norfolk S. Ry. Co. v. City of Alexandria*, 608 F.3d 150, 156 (4th Cir. 2010) (alteration in original) (first quoting *Monumental Paving & Excavating, Inc. v. Pennsylvania Mfrs' Ass'n Ins. Co.*, 176 F.3d 794, 797 (4th Cir. 1999), and then quoting Fed. R. Civ. P. 56(c)).

The relevant inquiry in the summary judgment analysis is "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine factual dispute exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–86 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48 (emphasis in original). A material fact is one that might affect the outcome of a party's case. *Id.* at 248; *JKC Holding Co. LLC v. Washington Sports Ventures, Inc.*, 264 F.3d 459, 465 (4th Cir. 2001). A genuine issue concerning a material fact only arises when the evidence, viewed in the light most favorable to the non-moving party, is sufficient to allow a reasonable trier of fact to return a verdict in that party's favor. *Anderson*, 477 U.S. at 248.

To defeat an otherwise properly supported motion for summary judgment, the

non-moving party must rely on more than conclusory allegations, "mere speculation or the building of one inference upon another," or "the mere existence of a scintilla of evidence" concerning a material fact. *Stone v. Liberty Mut. Ins. Co.*, 105 F.3d 188, 191 (4th Cir. 1997) (first quoting *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985), and then quoting *Anderson*, 477 U.S. at 252). Accordingly, to deny a motion for summary judgment, "[t]he disputed facts must be material to an issue necessary for the proper resolution of the case, and the quality and quantity of the evidence offered to create a question of fact must be adequate." *Thompson Everett, Inc. v. Nat'l Cable Advert., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995) (citing *Anderson*, 477 U.S. at 252). "Thus, if the evidence is 'merely colorable' or 'not sufficiently probative,' it may not be adequate to oppose entry of summary judgment." *Id.* (quoting *Anderson*, 477 U.S. at 249–50). The Court cannot weigh the evidence or make credibility determinations in its summary judgment analysis. *See Williams v. Staples, Inc.*, 372 F.3d 662, 667 (4th Cir. 2004).

## III.   ANALYSIS

### A. Plaintiffs Have Associational Standing to Bring Counts I and III.

DMAS raises several arguments as to whether Plaintiffs have shown they have standing to sue as to Counts I and III. (DMAS' Mem. in Supp. at 15.) First, DMAS argues Plaintiffs cannot meet the requirements for associational standing because their member providers do not have standing to enforce § 1396u-2(b)(2) of the Medicaid Act or 42 C.F.R § 438.114(d)(1)(i). (*Id.*) Second, DMAS maintains Plaintiffs have not identified a constitutionally protected property interest sufficient for standing to bring

their Takings Clause claim. (*Id.*) Thus, DMAS contends Plaintiffs' Amended Complaint fails to plead standing and invoke this Court's subject matter jurisdiction. (*Id.*)

A plaintiff must have standing to invoke a federal court's jurisdiction. *Allen v. Wright*, 468 U.S. 737, 750–51 (1984). The United States Supreme Court has held "the irreducible constitutional minimum of standing contains three elements." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 560 (1992). To demonstrate Article III standing, a plaintiff must first show a "concrete," "particularized," and "actual" or "imminent injury in fact." *Id.* Second, there must be a causal connection between the injury and the conduct complained of. *Id.* Third, the injury must be "likely" to occur, as opposed to merely "speculative," and the injury must be redressable by a favorable decision of the court. *Id.* at 561. The party invoking federal jurisdiction bears the burden of establishing these elements. *Id.*

Here, Plaintiffs rely not on any injury in fact they have suffered, but rather on injuries suffered by members of their various associations. (Pls.' Reply at 36, ECF No. 59.) "It is common ground that the respondent organizations can assert the standing of their members." *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). To do so, an association plaintiff must show: (1) that the organization's members have standing to sue in their own right; (2) the interests the organization seeks to protect must be germane to its cause; and (3) neither the claims nor the relief requested shall require the participation of the individual members in the lawsuit. *See Mgmt. Ass'n for Priv. Photogrammetric Surveyors v. United States*, 492 F. Supp. 2d 540, 549 (E.D. Va. 2007) (citing *Friends of*

20

*the Earth v. Laidlaw*, 528 U.S. 167, 181 (2000)); *see also Hunt v. Washington State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977). If an "association seeks a declaration, injunction, or some other form of prospective relief" that "if granted, will inure to the benefit of those members of the association actually injured," associational standing is virtually always present. *Warth v. Seldin*, 422 U.S. 490, 515 (1975); *see S. Lyme Prop. Owners Ass'n v. Town of Old Lyme*, 539 F. Supp. 2d 524, 535 (D. Conn. 2008) (holding that when a party seeks injunctive relief in a takings clause case, "the success of [the association's] claim does not depend on" any "ad hoc factual inquiry for each member").

DMAS argues that Plaintiffs fail the first and third requirements of associational standing. (DMAS' Mem. in Supp. at 22.) DMAS contends that Plaintiffs fail the first prong because their member providers do not have standing to enforce § 1396u-2(b)(2) of the Medicaid Act or 42 C.F.R. § 438.114(d)(1)(i). (*Id.*) DMAS further argues that the Plaintiffs have not identified any constitutionally protected property interest for the basis of their Takings Clause claim because "they do not have a property interest in billing Medicaid reimbursement rates." (*Id.*) The Court concludes that Plaintiffs have met the requirements for associational standing as to both Counts I and III.

Under the first prong, as to Plaintiffs' preemption claim under Count I, whether Plaintiffs have a cause of action under the Medicaid Act goes to the merits of Plaintiffs' claim, not whether Plaintiffs have suffered an injury in fact for standing purposes. "The question of standing is different. It concerns, apart from the 'case' or 'controversy' test, the question whether the interest sought to be protected by the complainant is arguably

within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Org., Inc. v. Camp*, 397 U.S. 150, 153 (1970). "The 'legal interests' test goes to the merits." *Id.* Thus, as further explained *infra*, the Court finds that Plaintiffs' members have sufficiently met the requirements of associational standing's first prong under Count I.

As to Plaintiffs' Takings Clause claim under Count III, Plaintiffs have identified a constitutionally protected property interest in both their physicians' professional services and the supplies they expend for patient treatment. The party invoking federal jurisdiction bears the burden of showing "an invasion of a legally protected interest." *Lujan*, 504 U.S. at 555. The threshold question in any Takings Clause claim is whether the plaintiff has a protected property interest. *See Story v. Green*, 978 F.2d 60, 62 (2d Cir. 1992) (citing *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000–04 (1984)) (other citations omitted). "[P]roperty interests . . . are not created by the Constitution. Rather, they are created and their dimensions defined by existing rules or understandings that stem from an independent source such as state law." *Ruckelshaus*, 467 U.S. at 1001.

DMAS argues that Plaintiffs have not identified a constitutionally protected interest because Plaintiffs do not have a legally recognized property interest in specific Medicaid reimbursement rates. (DMAS' Mem. in Supp. at 22.) Although DMAS is correct that Plaintiffs do not have a constitutionally protected property interest in Medicaid payment rates, *see Ruckelshaus*, 467 U.S. at 1007, that is a mischaracterization of the property interest at issue here. The Court concludes that Plaintiffs do have a

22

protected property interest in their physicians' professional services time and the supplies they expend in treating patients.

Fundamentally, "labor is property." *DeLisio v. Alaska Superior Ct.*, 740 P.2d 437, 440 (Ak. 1987) (citing *Coffeyville Vitrified Brick & Tile Co. v. Perry*, 76 P. 848, 850 (Kan. 1904)). "The laborer has the same right to sell his labor, and to contract with reference thereto, as any other property owner." *Id.* A professional's services "are no more at the mercy of the public, as to remuneration, than are the goods of the merchant, or the crops of the farmer, or the wares of the mechanic." *State ex rel. Scott v. Roper*, 688 S.W.2d 757, 762 (Mo. 1985). "Architects, engineers, physicians, and attorneys ordinarily purvey little or nothing which is tangible. It is their learned and reflective thought, their recommendations, suggestions, directions, plans, diagnoses, and advice that is of value . . . ." *Arnold v. Kemp*, 813 S.W.2d 770, 774 (Ark. 1991) (citing *State ex rel. Stephan v. Smith*, 747 P.2d 816, 841 (Kan. 1987)). Notwithstanding Plaintiffs' property interest in their labor, Plaintiffs certainly have a protected property interest in their supplies—the pills, swabs, probes, bandages, etc.—they use in treating their ER patients. Unquestionably, the Takings Clause provides that no private property shall be taken for public use, without just compensation, and it protects "private property" without any distinction between different types. *Horne v. Dep't of Agric.*, 576 U.S. 350, 358 (2015). Thus, the government cannot commandeer a professional's service and time for public use without providing just compensation.

DMAS cites to *Baker County* for the proposition that a hospital, who voluntarily

23

opts into Medicare and EMTALA, may not challenge as a taking the rate at which it is

compensated for the mandatory treatment of federal detainees. *Baker Cnty. Med. Servs.,*

*Inc. v. U.S. Atty. Gen.*, 763 F.3d 1274, 1275 (11th Cir. 2014). There, the court concluded

that a hospital may not bring such a challenge and pointed out that a "long line of cases

instructs that no taking occurs where a person or entity voluntarily participates in a

regulated program or activity." *Id.* (citing *Whitney v. Heckler*, 780 F.2d 963, 972 (11th

Cir. 1986)). Putting aside Plaintiffs' argument that they are mandated, rather than

voluntarily required, under Virginia law to participate in Medicaid and Medicare, this

case does not deal with a challenge to the reimbursement rates themselves like in *Baker*.

Here, Plaintiffs have stipulated that the level 1–5 rates DMAS pays for ER treatments are

reasonable. (Pls.' Reply at 30.) Plaintiffs instead are challenging the *denial* of

reimbursement rates for level 2–4 encounters that are deemed avoidable or preventable

ER diagnoses. (*Id.*) Essentially, Plaintiffs are not alleging that the rates themselves are

unreasonable, but that DMAS is effectively denying just compensation by the

downcoding that occurs after the ER's professional services and supplies have already

been permanently taken for public use.

Plaintiffs cite to *Sierra* to support their position that they have a property interest

in their ER supplies and facilities. *Sierra Med. Servs. All. v. Kent*, 883 F.3d 1216 (9th

Cir. 2018); *see also Anderson v. Chesapeake Ferry Co.*, 43 S.E.2d 10 (Va. 1947)

(recognizing that a ferry company had property interest in their ferries, along with their

facilities and equipment). In *Sierra*, ambulance companies brought a Takings Clause

24

claim challenging a California statute that required *all* ambulance companies to provide

emergency medical transportation irrespective of a patient's ability to pay and whether or

not they enrolled in Medicare or Medicaid. *Sierra Med. Servs. All.*, 883 F.3d at 1221,

1224. There, the district court held that plaintiffs did not have a "property interest in a

particular reimbursement rate," however, the Ninth Circuit reversed the district court,

identifying that plaintiffs did have a "property interest in their ambulances, equipment,

wages, [and] supplies . . ." sufficient for a Takings Clause claim. Thus, this Court is

persuaded that Plaintiffs are correct in asserting that the hospitals have a property interest

in their ER supplies and facilities. Accordingly, whether one looks at the professional

labor or the supplies and facilities as the private property interest at issue, Plaintiffs have

sufficiently identified a property interest for purposes of standing.

The hospital associations' members have shown they have suffered a "concrete

and particularized" injury in the alleged denial of appropriate payment for services and

supplies after those services and supplies have already been rendered. Additionally, they

have established that they have a property interest in the professional services and

supplies they expend in treating their patients. This alleged injury is "fairly traceable" to

DMAS as it is charged with promulgating the Downcoding Provision, and Plaintiffs'

injury would be redressed should this Court find in favor of Plaintiffs. Thus, Plaintiffs

have shown that their associations' members have standing to sue, and Plaintiffs have

satisfied associational standing's first prong on both Counts I and III.

As previously mentioned, DMAS also asserts that Plaintiffs cannot meet

associational standing's third requirement because "associational standing may be allowed only 'so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause.'" (DMAS' Mem. in Supp. at 22 (citing *Hunt*, 432 U.S. at 343–44).)  Under Plaintiffs' *per se* takings theory, Plaintiffs contend that individual participation of its members is unnecessary because, individualized economic analyses are not needed and the members' participation not required.  (Pls.' Reply at 37.)

DMAS relies on *Georgia Cemetery Association v. Cox* to demonstrate that the hospital association cannot establish standing without the participation of its members "because the economic impact of these provisions will vary depending upon the economic circumstances of each of its members." 353 F.3d 1319, 1322 (11th Cir. 2003). Thus, DMAS asserts standing cannot be shown unless an associational plaintiff can allege "an unconstitutional taking as to *all* of its members." *Id.* (emphasis added). However, as Plaintiffs correctly point out, this is not the standard under Fourth Circuit or Supreme Court precedent.  To establish standing, an "association must allege that its members, *or any one of them*, are suffering immediate or threatened injury." *Retail Indus. Leader Ass'n v. Fielder*, 475 F.3d 180, 186 (4th Cir. 2007) (quoting *Warth*, 422 U.S. at 511) (emphasis supplied by Fourth Circuit).  Thus, the question becomes not whether the challenged statute injures *each and every member*, but instead, whether any *one* of the members is "suffering immediate or threatened injury." *Id.* (emphasis added). Notwithstanding, Plaintiffs have established by affidavit that all VHHA members have

26

been economically harmed by the Downcoding Provision.[6]

Plaintiffs argue that no matter which member the Downcoding Provision applies to, that application is unlawful because they allege it is preempted by federal law or that it unlawfully takes property without just compensation. The Court concludes that individual members' participation is not required in the case for the success of their claims nor is it required for the relief Plaintiffs have requested. Thus, Plaintiffs satisfied the third prong requirements of associational standing.

For the foregoing reasons, Plaintiffs have established all the requirements for associational standing and may bring Counts I and III on their members' behalf.

**B. Neither Sections 1396u-2(b)(2) and 1396a(a)(10) of the Medicaid Act, Nor the Medicaid Regulations Provide Plaintiffs a Right of Action.**

Plaintiffs allege that the Downcoding Provision conflicts with §§ 1396u-2(b)(2) and 1396a(a)(10) and is therefore impliedly preempted by federal law. (Pls.' Reply at 15.) They argue the Downcoding Provision's reimbursement scheme is preempted because it is "inconsistent with [§] 1396u-2(b)(2)'s prudent layperson standard because it limits what constitutes an emergency medical condition." (Am. Comp. ¶ 70.) DMAS argues that neither those statutory provisions nor any Medicaid regulations provide

---

[6] The president of VHHA testified that all of VHHA's members have been harmed by the Downcoding Provision. (*See* Ex. 1 at ¶ 8, ECF No. 10-1.) In addition, when an associational plaintiff relies on injury in fact to fewer than all of its members, it must only "name [one or more] of the individuals who were harmed by the challenged" law and furnish "individual affidavits" establishing that at least "some" have been harmed. *Summers*, 555 U.S. at 498–99. Plaintiffs have done so. (*See* ECF Nos. 10-2–10-9.) Thus, Plaintiffs have adequately established injury in fact to some or all of its members.

27

Plaintiffs with a right of action to challenge whether the Downcoding Provision is preempted under federal law. (DMAS' Mem. in Supp. at 7.)

The Court agrees that neither §§ 1396u-2(b)(2) and 1396a(a)(10) nor any Medicaid regulations cited by Plaintiffs create a right of action for healthcare providers to assert a preemption claim because the protections within those provisions are phrased in terms of beneficiaries, not providers.

As previously mentioned, § 1396u-2(b)(2) of the Medicaid Act, titled "Beneficiary protections," require that MCOs provide coverage for emergency services when a patient satisfies the prudent layperson standard. CMS regulations impose the same requirement, specifying that MCOs must "cover and pay for emergency services," defined by the prudent layperson standard. 42 C.F.R. § 438.114(c)(1)(i). CMS regulations also prohibit states and their MCOs from limiting what constitutes an emergency medical condition based on lists of "diagnoses or symptoms." *Id.* § 438.114(d)(1)(i).

Comparatively, the Downcoding Provision provides that when an ER encounter, which is normally entered as a level 2, 3, or 4 CPT code, is deemed preventable or avoidable based upon a list of diagnoses provided by DMAS, the MCO shall not make payment at that level. *See* 2020 Va. Acts ch. 1289, 313.AAAAA. Instead, the MCO shall "downcode" the visit from the level 2, 3, or 4 code to a level 1 code, which covers less complicated treatments and reimburses at a lower rate. *Id.* This is done under the rationale that the ER should be reimbursed at the rate more "commensurate with the

28

acuity of the visit." *Id.* In sum, Plaintiffs maintain that the Downcoding Provision's mandates are inconsistent with their obligation to adhere to the prudent layperson standard.

The Supreme Court has held that "to seek redress through § 1983, . . . a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Blessing v. Freestone*, 520 U.S. 329, 343 (1997) (emphasis in original). As such, "it is *rights*, not the broader or vaguer 'benefits' and 'interests,' that may be enforced under [§ 1983]." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (emphasis in original). For a statute to create private rights, its text must be "phrased in terms of the persons benefited." *Id.* at 284 (citing *Cannon v. Univ. of Chicago*, 441 U.S. 677, 692, n.12 (1979)). But even if a statute is phrased in explicit rights-creating terms, "a plaintiff suing under an implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Id.* (citing *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001)) (emphasis in original). The question becomes "not simply who would benefit from the Act, but whether Congress intended to confer federal rights upon those beneficiaries." *California v. Sierra Club*, 451 U.S. 287, 294 (1981). Accordingly, if the text and structure of a statute provide no indication that Congress intended to create new individual rights, there is no basis for a private suit, whether under § 1983 or under an implied right of action.

In *Armstrong*, the Supreme Court held that the Medicaid Act did not create a private right of action against States for healthcare providers to seek injunctive relief to

29

enforce the Act's reimbursement rate standard. *Armstrong v. Exception Child Ctr., Inc.*, 575 U.S. 320, 327–329 (2015). There, the plaintiffs primarily asserted that the Supremacy Clause provided them a private cause of action to enforce 42 U.S.C. § 1396a(a)(30)(A). *Id.* at 326. In addition to holding that the Supremacy Clause is not the source of any federal rights nor does it create a cause of action, the Supreme Court also established that § 1396a(a)(30)(A) "lacks the sort of rights-creating language needed to imply a right of action." *Id.* at 331. The Supreme Court reasoned that providers were not the intended beneficiaries of the Medicaid agreement between the state and federal government, "which was concluded for the benefit of the infirm whom providers were to serve, rather than the benefit of the providers themselves." *Id.* at 332.

Before *Armstrong*, in *Wilder v. Virginia Hospital Association*, the Supreme Court held that the Boren Amendment, 42 U.S.C. § 1396a(a)(13)(A), provided a federal right to "reasonable and adequate reimbursement rates" that could be vindicated through a § 1983 action. 496 U.S. 498, 524 (1990). However, due to the confusion caused by *Wilder*, Congress "repealed the Boren Amendment, and replaced it with the notice-and-comment rulemaking requirements in place today." *Alaska Dep't of Health & Soc. Servs. v. Ctrs. for Medicare & Medicaid Servs.*, 424 F.3d 931, 941 (9th Cir. 2005). Importantly, the Fourth Circuit has held that there is no private right of action after the repeal of the Boren Amendment. *See HCMF Corp. v. Allen*, 238 F.3d 273, 276 (4th Cir. 2001) (holding that HCMF's claim was not cognizable because "a formal regulation cannot by itself give rise to a federal right enforceable under §1983").

Here, Plaintiffs assert that §§ 1396u-2(b)(2) and 1396a(a)(10) of the Medicaid Act and CMS' implementing regulations, 42 C.F.R. § 438.114(c)(1)(i), are "unambiguous rights-creating provisions enforceable through a § 1983 suit." (Pls.' Mem. in Supp. at 18.) However, none of those provisions either create a federal right or a cause of action for *healthcare providers*.

First, as a threshold matter, Plaintiffs argue § 1396a(a)(10) creates a cause of action for the first time in their briefing in support of their Motion for Summary Judgment, failing to reference this provision as a cause of action in either the Verified Complaint or the Amended Complaint. For this reason, the Court may disregard the argument. But even considering Plaintiffs' argument, that provision is still not a rights-creating provision.

Plaintiffs cite *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (2004) for the proposition that, even after *Gonzaga University*, the Medicaid Act still provides plaintiffs a cause of action for its enforcement in preemption challenges under § 1983. Crucially, the important distinction between *Sabree* and the current case is that *Sabree* held that the plaintiff *patients* had a cause of action under § 1983, not *providers*. *Id.* at 192. Indeed, § 1396a(a)(10) is couched in terms of beneficiary rights, not provider rights. Thus, *Sabree* still does not defend Plaintiffs' position that *providers* have a cause of action under that provision. Despite the *Sabree* ruling, other circuits have expressed skepticism about *Sabree*'s reasoning because it is "hard to reconcile the Supreme Court's post-*Wilder* doctrine—and multiple decisions since 2007 (such as *Armstrong* and *Astra USA*)

make it even harder to imply a private right of action." *Nasello v. Eagleson*, 977 F.3d 599, 602 (7th Cir. 2020).  Regardless of the skepticism, § 1396a(a)(10) is expressed in terms of "qualifying individuals," not healthcare providers, therefore, *Sabree* is distinguishable.

Turning to Plaintiffs' argument regarding § 1396u-2(b)(2) and 42 C.F.R. § 438.114(c)(1)(i), the same previously mentioned challenges plague Plaintiffs' position. First, as a threshold matter, "an administrative regulation . . . cannot create an enforceable § 1983 interest not already implicit in the enforcing statute." *Smith v. Kirk*, 821 F.2d 980, 984 (4th Cir. 1987); *see also Alexander*, 532 U.S. at 291 ("a federal regulation alone cannot create a private cause of action unless the enabling statute creates such a right or else authorizes the appropriate regulatory agency to do so").  Thus, if § 1396u-2(b)(2) of the Medicaid Act does not create the private right, Plaintiffs have no enforceable private right under 42 C.F.R. § 438.114.

Second, as to § 1396u-2(b)(2), it is again phrased in terms of protecting beneficiaries, not providers.  That provision is titled "Beneficiary Protections," not *provider* protections.  Furthermore, the provisions are framed in terms assuring Medicaid *beneficiaries'* access to emergency services. *See id.*  Plaintiffs argue that the Medicaid Act "elsewhere clarifies that coverage for medical services includes not only a guarantee to receive services, but a promise of payment for them." (Pls.' Reply at 19 (citing 42 U.S.C. § 1396d(a).)  Those clarifying provisions still do not present evidence that Congress intended the language to create a private cause of action for providers.  Even

32

assuming *arguendo* that § 1396d, which defines "Medical assistance" as "payment of part or all of the cost" of care and services, grants providers some reimbursement protection, the Downcoding Provision does not outright deny payments to providers. The Downcoding Provision still pays providers for "part" of the cost of avoidable or preventable ER visits by Medicaid and Medicare patients, albeit at a rate that providers do not find as fair or appropriate.

Accordingly, based on the statutory language and the Supreme Court's implied right of action jurisprudence, the Court concludes that Plaintiffs cannot establish that §§ 1396u-2(b)(2) or 1396a(a)(10) create a private cause of action for healthcare providers to assert a preemption claim under § 1983. Because the Medicaid Act provisions do not create a private cause of action for healthcare providers, the Court need not assess whether the Downcoding Provision violates those provisions on its face under a preemption theory. "When federal law creates a private right of action and furnishes the substantive rules of decision, the claim arises under federal law, and district courts possess federal-question jurisdiction under § 1331." *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 378–89 (2012). Here, federal law does not create the private right of action necessary for jurisdiction. Therefore, Plaintiffs' implied preemption claim under Count I should be dismissed because the Amended Complaint presents no federal question sufficient to confer jurisdiction under § 1331. Therefore, DMAS' Motion as to Count I will be granted, and Plaintiffs' Motion for Summary Judgment as to Count I will be denied. Count I will be dismissed with prejudice.

33

**C. Plaintiffs are Entitled to Relief Under the APA.**

In two respects, Plaintiffs argue CMS' approval of the Downcoding Provision violated the APA. First, they assert the provision is inconsistent with CMS' own implementing regulations, and the approval therefore was not done so in accordance with law. Second, they maintain the approval reflects an unreasoned, unexplained departure from settled agency policy, rendering it arbitrary and capricious.

The APA requires courts to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). In reviewing a rule, courts "must engage in a searching and careful inquiry of the administrative record, so that we may consider whether the agency considered the relevant factors and whether a clear error of judgment was made." *Casa de Maryland v. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019). The Court must ask whether the agency:

> [r]elied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Under the Medicaid Act, CMS may only approve plans that comply with

34

prevailing CMS regulations.  42 U.S.C. § 1396a(b); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 512 (2009) (an agency "may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books.").  The Medicaid statute expressly charges the Secretary of Health and Human Services with reviewing state Medicaid plans and amendments and provides that the Secretary "shall approve any plan which fulfills the conditions specified" by § 1396a(a).  42 U.S.C. § 1396a(b).

### 1. The State Plan Amendment is Not in Accordance with Law.

CMS' approval of the SPA was not done so "in accordance with law," and therefore, CMS erred in approving it.  The Medicaid Act requires that participating states "provide coverage for" emergency treatment to a patient whenever a prudent layperson confronting the same "symptoms" would be justified in seeking emergency care, regardless of the patient's ultimate diagnosis.  42 U.S.C. § 1396u-2(b)(2)(A)(i), (b)(2)(C). States and MCOs are prohibited from either (1) "deny[ing] payment for treatment obtained" where an "enrollee had an emergency medical condition," even if it is later determined that the patient's medical needs were non-emergent; or (2) "[l]imit[ing] what constitutes an emergency medical condition . . . on the basis of lists of diagnoses or symptoms."  42 C.F.R. § 438.114(c)(1)(ii), (d)(1).  "The only relevant considerations are the presenting symptoms and whether a prudent layperson would think that emergency medical attention is necessary based on the symptoms."  *Am. Coll. of Emergency Physicians v. Blue Cross & Blue Shield of Georgia*, 833 F. App'x 235, 237 (11th Cir. 2020).

Previously, in implementing and interpreting those requirements, CMS clarified

through a final ruling announcing that:

> [W]e prohibit the use of codes (either symptoms or final diagnosis) for
> denying claims because we believe there is no way a list can capture every
> scenario that could indicate an emergency medical condition under the BBA
> provisions . . . . The final determination of coverage and payment must be
> made taking into account the presenting symptoms rather than the final
> diagnosis. The purpose of this rule is to ensure that enrollees have unfettered
> access to health care for emergency medical conditions, and that providers
> of emergency services receive payment for those claims meeting that
> definition without having to navigate through unreasonable administrative
> burdens.

*Medicaid and Children's Health Insurance Program (CHIP) Programs*, 81 Fed. Reg.

27498, 27749 (May 6, 2016). Further, through binding regulation, CMS specified that a

state "Medicaid agency may not arbitrarily deny or reduce the amount, duration, or scope

of a required service . . . solely because of the diagnosis, type of illness, or condition." 42

C.F.R. § 440.230(c). CMS has also specified that neither a state agency nor a contracted

MCO may "deny payment for [emergency] treatment obtained" when the prudent

layperson standard is met, even when "the absence of immediate medical attention would

not" in actuality have resulted in serious injury or harm. *Id.* § 438.114(c)(1)(ii).

Furthermore, the Eleventh Circuit, in *American College of Emergency Physicians*,

clarified that "[t]he diagnosis the patient ultimately receives is irrelevant" for determining

whether emergency care was appropriately sought, provided, and paid for under the

prudent layperson standard. 833 F. App'x at 238–39. In that case, the defendant, Blue

Cross Blue Shield, "began retrospectively denying payments to healthcare providers by

36

reclassifying certain emergency department visits as 'non-emergent' using the diagnostic codes that were assigned to the visits." *Id.* at 238. Although the Eleventh Circuit assessed the claim under a Rule 12(b)(6) standard, the Court finds their review informative for how to interpret the prudent layperson standard as it relates to the denial of payment for services after they have been rendered.

Plaintiffs argue that this inappropriate denial of payment after the fact is precisely what the Downcoding Provision directs DMAS to do. Section 438.114(c)(1) expressly states that MCOs "may not deny payment for treatment obtained" when a patient presents with a medical condition that a prudent layperson could reasonable expect require emergency medical care, regardless of what the ultimate diagnosis may be. Here, the SPA requires that DMAS ultimately deny payment for level 2, 3, or 4 encounters in the ER whenever an encounter results in a specific diagnosis that has been predetermined as preventable. Based on this preventable final diagnosis, DMAS essentially acts after the fact as if the hospital expended simpler services and resources in treating the patient than they actually did. As a result, the hospital expends resources for which it is not reimbursed. This is not done to correct an error or misrepresentation by the hospital regarding the treatment provided or even because the level of care was inappropriate considering the presenting symptoms. Rather, the Downcoding Provision directs DMAS to downcode the visit to level 1 and to pay only a level 1 rate solely because the patient's *ultimate* diagnosis is on an "avoidable emergency room diagnosis code list." 2020 Va. Acts ch. 1289 at 369. Often times, as previously mentioned, physicians must expend

37

various resources in order to determine someone's ultimate diagnosis, and someone's

presenting symptoms may not clearly indicate what that ultimate diagnosis will be.

Essentially, the Downcoding Provision directs DMAS and MCOs to "deny payment for

treatment obtained" solely on the basis of "lists of diagnoses," without further review. 42

C.F.R. § 438.114(c)(1)(ii), (d)(1). This downcoding is inconsistent with applicable

statutes and prevailing regulations.

    In response, CMS asserts that Plaintiffs' argument mischaracterizes what is

actually happening. (CMS' Reply at 9, ECF No. 64.) CMS contends that "Virginia's

payment cap policy does not deny payment for the services beneficiaries 'actually

receive' or reclassify emergencies as non-emergencies. Instead, the policy caps payment

for emergency services furnished to individuals for whom the emergency was

preventable, which the state determines based on the patient's ultimate diagnosis." (*Id.*)

In other words, the Downcoding Provision is not "downcoding" anything, but rather caps

reimbursement rates for those claims. Therefore, CMS argues that even assuming the

prudent layperson standard does apply, the Downcoding Provision satisfies that standard

because it covers emergency services.

    Whether one calls the Downcoding Provision's effect a "downcode" or a

"payment cap," the end result is the same—it ultimately denies payment for the services

actually rendered in instances where the final diagnosis is listed as one deemed an

avoidable emergency diagnosis. This denial occurs regardless of what the presenting

symptoms of the patient were, which courts and CMS itself have clarified are what

38

ultimately matters.

Plaintiffs also argue that the Downcoding Provision is barred by 42 U.S.C.
§ 1396a(a)(10). Section 1396a(a)(10) requires that all state plans make "medical
assistance" available to qualifying individuals. The provision specifies that "medical
assistance" means either "care and services" or "payment" for care and services. 42
U.S.C. § 1396a(d)(a). In turn, § 1396a(a)(10)(B) requires that such medical assistance be
provided in *equal* measure to all Medicaid participants and that reimbursements "not be
less in amount" for any one category of Medicaid participant relative to others.

The Downcoding Provision is not consistent with these requirements. As
Plaintiffs point out, the reimbursements received for a Medicaid beneficiary presenting
with paralysis along one side of the face and receiving level 4 ER services will be "less in
amount" under the Downcoding Provision if his ultimate diagnosis is Bell's palsy than
would be received if their diagnosis were instead a stroke. The symptoms are essentially
the same, and the services are the same, but the reimbursement would be different. The
ER in both scenarios is *required* by both state and federal regulations to provide services
if the presenting symptoms satisfy the prudent layperson standard, however, their
reimbursement is "capped" or "denied" simply because the final diagnosis is deemed
non-emergent after the services are rendered. CMS' own guidance letter clarifies that
"[t]he final determination of coverage and payment must be made taking into account the
presenting symptoms rather than the final diagnosis." *Medicaid and Children's Health
Insurance Program (CHIP) Programs*, 81 Fed. Reg at 27749. The Downcoding

39

Provision simply relies on the final diagnosis as the sole basis for reimbursement with no consideration given to the presenting symptoms. Accordingly, the Downcoding Provision violates and is not in accordance with the standards set forth under 42 U.S.C. § 1396a(a)(10); 42 C.F.R. §§ 438.114(c)(1)(ii), (d)(1); and CMS' own guidance provided to state authorities.

CMS responds that "the only relevant statutory provision governing CMS' consideration of state plan amendments is codified at § 1396a(a)" and that the "prudent layperson standard is completely separate from the statutory provisions setting forth what CMS must consider when reviewing state plan amendments and subject to different rules." (CMS' Mem. in Supp. at 19). Accordingly, CMS argues that the only relevant considerations governing CMS' review of a SPA is "whether it complies with the requirements under § 1396a(a) and does not impose one of the enumerated impermissible conditions of eligibility." (CMS' Opp'n at 20.)

Section 1396a(a) provides that CMS

shall approve any plan which fulfills the conditions specified in [§ 1396a(a)], except that he shall not approve any plan which imposes, as a condition of eligibility for medical assistance under the plan . . . (1) an age requirement of more than 65 years; or (2) any residence requirement which excludes any individual who resides in the State, regardless of whether or not the residence is maintained permanently or at a fixed address; or (3) any citizenship requirement which excludes any citizen of the United States.

Therefore, CMS argues that given that context and that Plaintiffs challenge the sufficiency of the Medicaid reimbursement providers receive, the only provision of the Medicaid Act that could be at issue is § 1396a(a)(30)(A). (*See* CMS' Opp'n at 14.)

Section 1396a(a)(30)(A) requires states to "provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan" as may be necessary "to assure that payments are consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). Section 1396a(a)(30)(A) thus requires States to "assure that payments to providers produce four outcomes: (1) 'efficiency,' (2) 'economy,' (3) 'quality of care,' and (4) adequate access to providers by Medicaid beneficiaries." *Pa. Pharmacists Ass'n v. Houstoun*, 283 F.3d 531, 537 (3d Cir. 2002) (en banc) (footnote omitted); *see also Rite Aid of Pa., Inc. v. Houstoun*, 171 F.3d 842, 851 (3d Cir. 1999) (holding that § 1396a(a)(30)(A) requires "substantive compliance with its specified factors of efficiency, economy, quality of care, and access."). Therefore, while § 1396a(a)(30)(A) "does not demand that payments be set at levels that are sufficient to cover provider costs," it allows states to set a rate methodology using "any process that is reasonable, considers more than simply budgetary factors, and results in payments that are sufficient to meet recipients' needs." *Christ the King Manor, Inc. v. Sec'y U.S. Dep't of Health &*

41

*Human Servs.*, 730 F.3d 291, 308 (3d Cir. 2013).[7]

In considering whether a proposed SPA satisfies the requirements of § 1396a(a)(30)(A), CMS has previously asked states "to demonstrate that the SPA would not negatively impact the state's Medicaid population's access to care 'relative to that of the general population.'" (CMS' Opp'n at 15–16 (quoting 42 U.S.C. §1396a(a)(30)(A)).) CMS argues that the record here amply supports the Secretary's determination that Virginia's payment cap policy is consistent with the requirements of § 1396a(a)(30)(A).

First, CMS contends that Virginia noted in its submission that its SPA would apply only to Medicaid beneficiaries who are enrolled in fee-for-service Medicaid. That is because "almost 95% of the Medicaid population in Virginia is in managed care waivers," it was "difficult to evaluate access for the small remaining [fee-for-service] population that would be subject to the payment cap policy[.]" AR at 1241. CMS concluded that "[b]ecause the state plan amendment would affect reimbursement for such a small number of beneficiaries, any reduction in payment rates to providers would be either small or nonexistent and therefore there would be adequate access to providers for Medicaid beneficiaries under the state plan." (CMS' Opp'n at 16.) Second, CMS determined that the Downcoding Provision would result in payment rates that promote

---

[7] Although the United States Courts of Appeals for the Third Circuit, in *Christ the King Manor*, stated that payment rates are not required to be sufficient to cover provider costs, the court went on to clarify that "a focus on recipients that gives no thoughts to provider costs will soon leave ample demand from needy recipients and no providers to supply services." 730 F.3d at 308. Thus, "[s]etting payment levels to meet recipients' needs must therefore inevitably take into account provider costs." *Id.*

efficacy and economy by adopting differential rates for ER visits that DMAS has deemed to be preventable and incentivizing hospitals and physicians to work toward reducing the number of preventable ER visits. (*Id.* at 16–17.) Third, CMS determined that the Downcoding Provision was unlikely to result in access issues because DMAS had previously implemented a similar policy in 2016 and had observed no negative impact on access to providers for Medicaid beneficiaries. (*Id.*) Fourth, CMS considered the comments raised during DMAS' public-comment period as well as comments provided by outside stakeholders while the SPA was pending before CMS. (*Id.*) Based on those comments, CMS posed specific questions to DMAS to determine whether the concerns raised by commentors suggest Virginia's SPA will violate any of § 1396a(a)(30)(A)'s requirements. (*Id.*) Fifth, CMS considered DMAS' explanation that providers would receive net increases in their Medicaid reimbursement after accounting for other payment models that DMAS had already adopted. (*Id.*) After weighing those considerations, CMS determined that Virginia's SPA satisfied those requirements, and it argues that determination was reasonable.

On the other hand, Plaintiffs maintain that the Court must view the statutory and regulatory scheme as a whole when determining whether § 1396a(a)(30)(A)'s requirements, along with other requirements found in the Medicaid Act, such as the prudent layperson standard, have been met in a state's SPA. (Pls.' Reply at 5.) They argue the Court must not focus on "isolated provisions" of the Medicaid Act, but rather, must give full meaning and effect to the "overall statutory scheme." (*Id.*) Against that

43

backdrop, Plaintiffs contend § 1396a(a)(30)(A) "cannot be understood to grant CMS authority to approve state plan amendments that achieve cost savings by any means necessary, including by violating other statutory limitations in the Medicaid Act." (*Id.* at 6.)

The Court agrees with CMS that the prudent layperson standard imposed under § 1396u-2(b) is not explicitly listed under § 1396a(a), and the prudent layperson standard also does not appear explicitly within 42 C.F.R. §§ 438.114(c)(1)(ii) and (d)(1). While CMS is also correct in stating that § 1396a(a) guides CMS' decision to approve a SPA, that provision alone does not give CMS free reign to approve a cost-saving SPA that conflicts with other portions of the Medicaid Act. CMS is tasked both with ensuring that the requirements of § 1396a(a) are met, but also that the state's SPA complies with the other requirements found in the Medicaid Act. "Congress explicitly granted the Secretary authority to determine whether a State's Medicaid plan complies with federal law." *Managed Pharmacy Care v. Sebelius*, 716 F.3d 1235, 1249 (9th Cir. 2013).

Given that background, "the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989). "A court must therefore interpret the statute 'as a symmetrical and coherent regulatory scheme,' *Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995), and 'fit, if possible, all parts into a harmonious whole,' *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959)." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Thus, this Court's role in construing and applying the

44

language of the Medicaid Act is not done with a focus on "isolated provisions," and instead, must give meaning and effect to the overall statutory scheme. *King v. Burwell*, 576 U.S. 473, 486 (2015) (holding that when courts interpret statutory language, they must read the words "in their context and with a view to their place in the overall statutory scheme") (citations omitted).

As such, Plaintiffs argue that a state's pursuit of "efficiency" and "economy" must be bound "by the standards and requirements elsewhere imposed by Congress in its overall design of the Medicaid Scheme." (Pls.' Reply at 6 (citing *Rehab. Ass'n of Virginia, Inc. v. Kozlowski*, 42 F.3d 1444, 1447 (4th Cir. 1994) ("Participating states are required to comply with the Medicaid Act and its implementing regulations issued by the DHHS.")).) Plaintiffs contend that the countervailing factors CMS must balance when assessing a state's pursuit of efficiency and economy under §1396a(a)(30)(A)—namely, "quality of care" and adequate access to care—show that Congress intended CMS to also consider the other substantive requirements of ER services in CMS' SPA approval process. (*Id.*) That includes the "requirement that emergency care must be furnished *and compensated* whenever the prudent layperson standard is satisfied. (*Id.* (citing 42 U.S.C. §§ 1396u-2(b)(2), 1395dd(b); *Am. Coll. of Emergency Physicians*, 833 F. App'x at 238–39).) Thus, Plaintiffs argue that any plan that conflicts with the prudent layperson standard also fails § 1396a(a)(30)(A)'s quality-of-care and adequate-access-to-care requirements.

CMS counters that Plaintiffs are fundamentally misreading the Medicaid statute

45

because § 1396u-2(b)(2) only applies to care provided by MCOs under managed care contracts, not fee-for-service care provided by DMAS under Virginia's state plan. (CMS' Opp'n at 19.)  Thus, § 1396u-2(b)(2) cannot be enforced through SPA approvals. (*Id.*)  Plaintiffs respond by pointing to the requirements under § 1396a(a)(10)(B), which require state plans furnishing fee-for-service care to ensure that such care "not be less in amount, duration, or scope than the medical assistance made available to individuals not" covered by the fee-for-service program.  In essence, Plaintiffs maintain that the § 1396a(a)(10)(B) requirements "effectively sets MCO coverage as the baseline for state-plan coverage and vice-versa," meaning that neither can be "less" than the other. Therefore, managed care and fee-for-service care are not "subject to different rules" in any relevant way, as CMS contends, and even if that were not so, § 1396a(a)(10)(A) requires that every state plan "mak[e] medical assistance available" to all low-income individuals.[8]  (Pls.' Reply at 8.)

The Court concludes that the Downcoding Provision violates § 1396a(a)(10)(B) itself, insofar as it provides reimbursement to Medicaid enrollees at higher rates than others for the same ER services, simply because the final diagnosis is different and deemed "preventable."  CMS argues that § 1396a(a)(10)(B) does not address payment and only requires that "Virginia's state plan ensures services provided to Medicaid

---

[8] Section 1396d(a) defines "medical assistance" to include payment for the cost of care of inpatient and outpatient hospital services and associated physician services, necessarily including the emergency care mandated by EMTALA, 42 U.S.C. § 1395dd(b), which further incorporates the prudent layperson standard.

beneficiaries are comparable to other relevant individuals." (CMS' Opp'n at 21.)
However, 42 U.S.C. § 1396d(a) clearly defines "medical assistance" as not only "care
and services" but also "payment" for care and services. Thus, as Plaintiffs point out,
§ 1396a(a)(10)(B), by its plain terms, requires equivalence not only of covered care
across Medicaid beneficiaries, but also regarding reimbursements for care.

CMS contends this conclusion is incorrect because "[b]eneficiaries do not receive
reimbursement for services, providers do." (CMS' Opp'n at 21.) "Medicaid will
continue to pay for the same services under Virginia's payment cap SPA, and Plaintiffs
cannot point to any evidence that Virginia's payment cap policy has reduced services at
all." (*Id.*) Of course, beneficiaries are not the ones receiving the reimbursement for care
and services, the providers are. That is because the rights of the individuals to receive
reimbursements have been assigned to the providers. *See United States v. Fadul*, No. 11-
0385, 2013 WL 781614, at *1 (D. Md. 2013) (providers "receive[] the patient's right to
reimbursement" by assignment); *Am. Coll. of Emergency Physicians*, 833 F. App'x at
240 (providers are paid directly, and thus have standing to sue, because "beneficiaries
assigned the hospital their right to receive payment of benefits") (quotation marks
omitted).

While the Court agrees that § 1396a(a)(10)(B) requires that services provided to
Medicaid beneficiaries be comparable to other relevant individuals, the *payment for* those
services is also inextricably intertwined by definition under § 1396d(a). Therefore,
although services for those with similar presenting symptoms but different final

47

diagnoses will be comparable, it is indisputable that reimbursement for those services will be different if the final diagnoses are deemed "preventable."

Thus, because the Downcoding Provision conflicts with other requirements within the Medicaid Act, CMS' approval of the Downcoding Provision was not in accordance with law and will be vacated and set aside.

### 2. CMS' Approval of the Downcoding Provision was Arbitrary and Capricious.

Section 706(2)(A) of Title 5 of the U.S. Code provides that a "reviewing court shall hold unlawful and set aside agency action . . . found to be arbitrary [and] capricious." This line of review asks whether the agency has articulated a rational basis for its decision. *State Farm Mut. Auto. Ins.*, 463 U.S. at 50. "An agency satisfactorily explains a decision when it provides enough clarity that its 'path may reasonably be discerned.'" *Casa De Maryland*, 924 F.3d at 703 (quotations omitted). "If the agency provides such an explanation," the Court must "uphold its decision," but "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.* (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)). And a Court may not "supply a reasoned basis for the agency's action that the agency itself has not given." *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947).

First, CMS argues that its "approval of a [SPA] is not a rulemaking under the APA." (CMS' Suppl. Resp. at 1, ECF No. 72.) As such, CMS contends it was not

48

required to address any of the comments brought before it nor did it need to articulate its reasoning for approving the SPA. (*Id.* at 6.)

Under the Supreme Court's decision in *Mead Corp.*, "administrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority." *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). As additionally noted by the United States Courts of Appeals for the Third and Ninth Circuits, "the Supreme Court '[a]rguably . . . has already concluded that SPA approvals meet' the standard, and thus are entitled to *Chevron* deference." *Christ the King Manor*, 730 F.3d at 306 (quoting *Sebelius*, 716 F.3d at 1246).

In *Douglas*, the Supreme Court stated that "[t]he Medicaid Act commits to the federal agency the power to administer a federal program," and that "the agency has acted under [that] grant of authority" in approving a SPA. *Douglas v. Indep. Living Ctr. of S. California, Inc.* 565 U.S. 606, 614 (2012). Furthermore, the Third Circuit clarified in *Christ the King Manor*, that courts "have repeatedly assured" Medicaid providers and recipients that the statutory requirements of the Medicaid Act will not go unenforced because the Secretary "[is] responsible for ensuring that state plans are administered in accordance with these requirements." 730 F.3d at 313 (citations omitted). "It would be arbitrary and capricious for [the Secretary] to approve the SPA based solely on soothing words from the state. For that reason, the burden is on the agency, not on the reviewing

49

court, to supply a reasoned basis for its action." *Id.* at 314 n.23.

Here, CMS failed to provide any analysis or explanation in response to the comments whatsoever. Plaintiffs and others sent multiple letters to the relevant CMS decisionmakers detailing the ways in which the Downcoding Provision violates the applicable statutes, regulations, and CMS' own guidance. *See* AR 25–29, 157–59, 160–62, 164–78, 180–84. CMS' approval of the amendment did not provide any explanation or justification, nor any direct response to the comments received. CMS' failure to "satisfactorily explain its disagreement with the proliferation of negative comments" or provide rationale as to why Virginia's responses to CMS' inquiries were adequate renders its approval of the Downcoding Provision arbitrary and capricious. *Mayor of Baltimore v. Azar*, 973 F.3d 258, 280–82 (4th Cir. 2020).

The failure to explain its decision is of particular concern because CMS' own preexisting regulations and guidance cast direct doubt on the lawfulness of the Downcoding Provision. As noted previously, the Director of CMS explained:

> "[w]henever a payer (whether an MCO or a State) denies coverage *or modifies a claim for payment*, the determination of whether the prudent layperson standard has been met must be based on all pertinent documentation, *must be focused on the presenting symptoms (and not on the final diagnosis)*, and must take into account that the decision to seek emergency services was made by a prudent layperson (rather than a medical professional)."

(Westmoreland's Letter at 556–57, ECF No. 10-10 (emphasis added).)

Additionally, according to that letter, "unless an MCO or a State has reason to believe that a provider is 'upcoding' or engaging in activity violating program integrity, all

50

claims coded as CPT 99283 through 99285 . . . should be approved for coverage." *Id.*;

*see also, e.g.*, *Medicaid and Children's Health Insurance Program (CHIP) Programs*, 81

Fed. Reg. 27498, 27749 (May 6, 2016) (explaining that "[t]he final determination of

coverage and payment must be made taking into account the presenting symptoms rather

than the final diagnosis"); *Requirements Related to Surprise Billing—Part I*, 86 Fed. Reg.

36787, 36789 (July 13, 2021) (stating that to "automatically deny coverage based on a list

of final diagnosis codes initially, without regard to the individual's presenting symptoms"

is "inconsistent with the emergency services required of the No Surprises Act and the

[Affordable Care Act]," which both incorporate the Prudent Layperson Standard).

Although CMS is entitled to change its position with respect to the appropriate

calculation and reimbursement of emergency treatment, it may not do so without

explaining its reasoning. *See Motors Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*

*Co.*, 463 U.S. 29, 56 (1983) ("While the agency is entitled to change its views on the

acceptability of [a prior policy], it is obligated to explain its reasoning for doing so.").

CMS was required to provide at least a reasoned explanation for its departure from its

previously stated policies, and its failure to do so even at a minimal level was arbitrary

and capricious." *Encino Motorcars*, 136 S. Ct. at 2125.

CMS also contends that its "approval is most reasonably understood to be based

on its consideration of Virginia's responses to arguments raised in public comments,

answers to CMS' questions, and other information the Commonwealth submitted during

the approval process . . . ." (CMS' Suppl. Mem. at 3.) In its decision letter approving

Virginia's SPA, CMS stated, "[b]ased upon the information provided by the State, we have approved the amendment with an effective date of July 1st, 2020." AR at 2. CMS argues that the Court should not consider the December 22, 2021 approval letter "in isolation" but should review it "in [the] context of the record as a whole." (CMS' Suppl. Mem. at 3.)

The Court finds that CMS' statement in the December 22, 2021 approval letter was insufficient rationale for its decision to approve Virginia's SPA. Although nothing necessarily prevents CMS from adopting and agreeing with the rationale provided by DMAS, before it can do so, it must "'critically review[]' the third party's analysis or 'perform[] its own.'" *In re NTE Conn., LLC*, F. 4th 980, 988 (D.C. Cir. 2022) (quoting *Susquehanna Int'l Grp., LLP v. SEC*, 886 F.3d 442, 447 (D.C. Cir 2017)). This is increasingly more important when an agency defers to the "self-serving views of the regulated entit[y]." *Susquehanna*, 866 F.3d at 447 (quoting *NetCoalition v. SEC*, 615 F.3d 525, 541 (D.C. Cir. 2010)).

Here, even taking the approval letter in context with the rest of the administrative record, nothing indicates that CMS justified its reliance on the information and responses provided by DMAS. The Court does acknowledge that the record shows that there was some back and forth between CMS and DMAS regarding some of Plaintiffs' concerns. AR at 436–40, 1168–73, 1237–45. However, DMAS' response to comments and inquiries from CMS demonstrate DMAS' rationale, not CMS' reasoning for why it found that rationale persuasive. As mentioned previously, CMS must conduct its own review.

It cannot simply just rely on "soothing words from the state." *Christ the King Manor*, 730 F.3d at 3114 n.23.

Because CMS failed to provide any explanation at all for its approval of Virginia's SPA, the Court finds that CMS' approval of the Downcoding Provision was arbitrary and capricious. As such, that approval must be vacated.

For the foregoing reasons, the Court concludes that CMS' approval of the Downcoding Provision was not done so in accordance with law because its downcoding or capping of reimbursement rates for services already provided based on lists of avoidable diagnoses conflicts with other requirements within the Medicaid Act. Furthermore, CMS not providing any reasoning or rationale for its approval of the Downcoding Provision was also arbitrary and capricious. Accordingly, Plaintiffs' Motion for Summary Judgment as to Count II will be granted, and CMS' approval of the Downcoding Provision will be vacated and set aside. CMS' Motion for Summary Judgment as to Count II will be denied.

## C. Plaintiffs' Takings Clause Claim.

Lastly, in Count III, Plaintiffs argue the Downcoding Provision unconstitutionally denies hospitals and physicians just compensation for the *per se* taking of their property, in violation of the Fifth Amendment's Takings Clause. Plaintiffs' position is straight-forward: "A state cannot compel a private party to devote four hours of professional services time and expend four units of supplies for public use, while in turn furnishing fair compensation for just one hour and one unit of supplies. To do so is to take three

53

hours and three widgets without any compensation at all, violating the Takings Clause."
(Pls.' Mem. in Supp. at 21.)

### 1. As to the Federal Defendants, Plaintiffs Have Not Pled a *per se* Taking.

The Takings Clause prohibits state or local governments from taking "private property . . . for public use, without just compensation." U.S. Const. amend. V. The Takings Clause imposes a "'categorical duty' under the Fifth Amendment to pay just compensation when it physically takes possession of an interest in property," whether real or personal property. *Horne*, 576 U.S. at 357. The Takings Clause protects "traditional property interests" recognized according to "traditional rule[s]" of property law. *Phillips v. Washington Legal Found.*, 524 U.S. 156, 167 (1998). As previously mentioned, recognized property interests include providers' interests in their buildings and land; the machines, equipment, furniture, and supplies in those buildings; the wages they pay physicians and staff; as well as physicians' own interests in their personal professional services. *See supra* III. A.; *see also Kent*, 883 F.3d at 1224–25; *Anderson*, 43 S.E.2d at 17.

Plaintiffs argue that EMTALA's requirement that all Medicare-participating hospitals operating an ER must treat all patients presenting with an emergency medical condition effects a *per se* taking. (Pls.' Mem. in Supp. at 22.) Under EMTALA, they argue that providers are forbidden from excluding from their "waiting areas, exam rooms, imaging rooms, and operating theaters" any patient who presents in the ER with emergency conditions and requires access to those rooms and their equipment for

screening and stabilization. (*Id.*); *see* 42 U.S.C. § 1395dd(b).  Likewise, physicians, staff, the providers' machines, equipment, furniture, and supplies are all pressed into service for such screening and stabilization. (*Id.*)

It is well established that plaintiffs cannot demonstrate a taking based on an obligation arising under a federal program in which they voluntarily participate. *See Ruckelshaus*, 467 U.S. at 1007; *Satellite Broad. & Comms Ass'n v. F.C.C.*, 275 F.3d 337, 368 (4th Cir. 2001) (concluding that a statute that "merely places conditions on . . . use of a benefit . . . the government need not have conferred" cannot be an unconstitutional taking).  The two United States Courts of Appeals that have considered the matter have seemingly expressed that EMTALA's requirements cannot give rise to a Takings Clause claim. *See Baker Cnty. Med. Servs., Inc.*, 763 F.3d at 1279; *Burditt v. U.S. Dep't of Heath & Hum. Servs.*, 943 F.2d 1362, 1376 (5th Cir. 1991).  As these Circuit Courts and the Supreme Court explain, the federal government action giving rise to a Takings Clause claim must "legally compel[]" an obligation affecting property for it "to give rise to a taking." *Garelick*, 987 F.2d at 916.  That is true even if "business realities" effectively dictate participation. *Minn. Ass'n of Health Care Facilities, Inc. v. Minn. Dep't of Pub. Welfare*, 742 F.2d 442, 446 (8th Cir. 1984).

Plaintiffs argue that the "legally compelled" component is met here because Virginia's COPN program necessarily mandates a hospital's participation in Medicare, and as a result, participation in EMTALA. (Pls.' Mem. in Supp. at 25.)  Regardless of the merits of that argument, the issue with Plaintiffs' argument is that those *state law*

COPN requirements have no bearing on whether providers' participation in Medicaid and Medicare are voluntary as a matter of *federal* law. *See Garelick*, 987 F.2d at 916 (rejecting similar argument). As to the federal Defendants, Plaintiffs cannot show as a matter of federal law that they are legally compelled to participate in Medicare and EMTALA for purposes of establishing a Takings Clause claim against CMS. There is no legal compulsion for the participation in Medicare by CMS or federal law, and therefore, Plaintiffs' voluntary participation in Medicare simply conditions the receipt of beneficial government funds on meeting the requirements under EMTALA, which courts have consistently held cannot be considered a taking.

Plaintiffs rely on *Horne* and other "unconstitutional conditions" cases to argue that the voluntary-participation doctrine does not apply here. That reliance is incorrect. *Horne* is distinguishable because it involved a regulatory scheme in which plaintiffs were forced to yield part of their property, their crop of raisins, to the government without receiving *any benefit whatsoever*. *Horne*, 576 U.S. at 366. There, the plaintiffs did not receive any government benefit apart from being allowed to exercise ordinary property rights over the remainder of their raisins that the government did not take. *Id.* Here, EMTALA places conditions as requirements to receive the benefits of government reimbursement through Medicare. Plaintiffs are receiving the financial benefit of deriving income from Medicare and by opting into receiving that benefit, they are required to abide by EMTALA's requirements. Thus, *Horne* is distinguishable because the plaintiffs there received no benefit at all from the government taking their raisin crop.

56

Considering Plaintiffs "unconstitutional conditions" argument, under that doctrine, the government may not leverage its position as a regulator to make "extortionate demands" of market participants when doing so would "frustrate the Fifth Amendment right to just compensation." *Koontz v. St. Johns River Water Mgmt. Dist.*, 570 U.S. 595, 605 (2013). However, *Koontz* still does not alleviate the main issue with Plaintiffs' Takings Clause argument. It is the *Virginia state law* COPN program that is allegedly making "extortionate demands" not the *federal* government. Thus, as it relates to CMS, Plaintiffs have not pled a *per se* Takings Clause claim.

### 2. The Eleventh Amendment Bars Plaintiffs' Takings Clause Claim Against DMAS.

As to Plaintiffs' Takings Clause claim against DMAS, the Virginia state Defendant here, Plaintiffs' position that they are legally compelled to participate in Medicaid and Medicare programs under the COPN program is likely correct. Under the COPN program, Virginia requires hospitals to obtain certificates to build, improve, or maintain almost any facility at an acute care hospital. Va. Code Ann. § 32.1-102.1:3(B). Virginia expressly conditions the granting of such certificates "upon the agreement of the applicant to provide care to" Medicare and Medicaid patients. *Id.* § 32.1-102.4(B). Every acute care hospital requires such certificates. Thus, in essence, Virginia legally compels any healthcare system with an acute care hospital in Virginia to participate in Medicare and Medicaid. However, the Court need not fully determine whether Virginia's COPN program amounts to legal compulsion because, despite the COPN requirements,

57

Plaintiffs' Takings Clause claim against DMAS is barred by the Eleventh Amendment to the United States Constitution.

DMAS argues that Defendant Cheryl Roberts, as its official Interim Director, is immune from suit under the Eleventh Amendment. (DMAS' Mem. in Supp. at 26–27.) Plaintiffs counter by arguing that the *Ex parte Young* exception to sovereign immunity for suits to enjoin State officials in their official capacities from engaging in future conduct that would violate the Constitution should apply. *See Ex parte Young*, 209 U.S. 123 (1908); *see also Antrican v. Odom*, 290 F.3d 178, 184 (4th Cir. 2002). The Court concludes that Plaintiffs' Takings Clause claim against DMAS is barred by the Eleventh Amendment.

Plaintiffs' argument ignores the Supreme Court's holding in *Knick*, which seems to foreclose injunctive relief under these circumstances. *See Knick v. Twp. of Scott*, 139 S. Ct. 2162 (2019). In *Knick*, a landowner sued a town in federal court after it enacted an ordinance permitting public access to a cemetery on her property. *Id.* at 2168. The landowner claimed that the ordinance effected a taking of her property, and she sought declaratory and injunctive relief but not just compensation. *See id.* At issue was an older Supreme Court decision holding that a property owner must exhaust state law just compensation remedies before bringing a Takings Clause claim in federal court. *See Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 573 U.S. 172, 195 (1985). *Knick* overruled *Williamson Cnty.*, holding that "[a] property owner may bring a Takings claim under § 1983 upon the taking of his property without just compensation by a local

58

government." *Knick*, 139 S. Ct. at 2179.

Crucially, *Knick* involved a locality, and the Supreme Court's holding only addressed Takings Clause claims against local governments. The decision did not discuss Eleventh Amendment immunity because this immunity protects states and state officials from suit but "does not extend to counties and similar municipal corporations." *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977). More importantly, the Court stated:

> Today, because the federal and nearly all state governments provide just compensation remedies to property owners who have suffered a taking, equitable relief is generally unavailable. *As long as an adequate provision for obtaining just compensation exists, there is no basis to enjoin the government's action effecting a taking.*

*Knick*, 139 S. Ct. at 2176 (emphasis added).[9]

Plaintiffs assert that DMAS' position "would effectively reinstate the 'state-litigation requirement' that the Supreme Court expressly overruled in *Knick*. (Pls.' Reply at 35.) But, Plaintiffs conflate actions against *local governments*, which are not immune, with *states*, which are immune, pursuant to the Eleventh Amendment. "Someone whose

---

[9] *See also City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 714 (1999) ("The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation."); *First English Evangelical Lutheran Church of Glendale v. Los Angeles Cnty.*, 482 U.S. 304, 315 (1987) ("The Clause is designed not to limit the governmental interference with property rights per se, but rather to secure compensation in the event of otherwise proper interference amounting to a taking."); *Ruckelshaus*, 467 U.S. at 1016 ("Equitable relief is not available to enjoin an alleged taking of private property for a public use, duly authorized by law, when a suit for compensation can be brought against the sovereign subsequent to the taking.")

59

property has been taken by a *local government* has a claim under § 1983 . . . that he may
bring upon the taking in federal court . . . without first bringing any sort of state lawsuit,
even when state court actions addressing the underlying behavior are available." *Knick*,
139 S. Ct. at 2172–173.  Plaintiffs argue that this immunity only applies to damages or
retrospective monetary claims.  As outlined in *Hutto v. S. Carolina Ret. Sys.*, 773 F.3d
536 (4th Cir. 2014), a state enjoys sovereign immunity from a Takings claim in federal
court so long as state courts remain available to hear such claims.  "*Knick* did not
undermine *Hutto*, where this Court held sovereign immunity to bar a Takings claim
against a State in federal court if state courts remain open to adjudicating the claim." *Zito
v. N.C. Coastal Res. Comm'n*, 8 F.4th 281, 286–88 (4th Cir. 2021).

Virginia law supplies two independent just compensation remedies.  *See Kitchen
v. City of Newport News*, 657 S.E.2d 132, 141–42 (Va. 2008).  First, Article I, Section 11
of the Virginia Constitution provides that "[n]o private property shall be damaged or
taken for public use without just compensation to the owner thereof."  This constitutional
provision "is self-executing and permits a property owner to enforce his constitutional
right to just compensation in a common law action" under an implied contract theory.
*Kitchen*, 657 S.E.2d at 140.  Second, under Va. Code § 8.01-187, a property owner may
"file a complaint for declaratory judgment to determine the compensation to be paid."
*Byler v. Va. Elec. & Power Co.*, 731 S.E.2d 916, 919–20 (Va. 2012).[10]  Here, Plaintiffs

---

[10] Considering Va. Code § 8.01-187, the Fourth Circuit has held that "Virginia law provides an
adequate procedure for obtaining compensation for a taking."  *Presley v. City of Charlottesville*,

do not contest the adequacy of Virginia's remedies to obtain just compensation. Instead, Plaintiffs claim they are impeded because state law sets the reimbursement rates. Plaintiffs cannot establish that the *Ex parte Young* exception should apply, as what they are seeking is really just compensation. "The relief here sought is prospective only, and *it is a simple request to ensure that just compensation is provided* pursuant to the very state administrative scheme established by DMAS." (Pls.' Reply at 34 n.3) (emphasis added).

Therefore, because Plaintiffs seek to enforce their Takings Clause claim through injunctive relief and a suit can be brought against DMAS in state court to seek just compensation, Plaintiffs' claim against DMAS is barred by Eleventh Amendment immunity. Accordingly, DMAS' and CMS' Motions for Summary Judgment as to Count III will be granted. Plaintiffs' Motion for Summary Judgment as to Count III will be denied. Count III will be dismissed with prejudice.

## IV.    CONCLUSION

Based on the foregoing, the Court will grant Plaintiffs' Motion for Summary Judgment (ECF No. 52) as to Count II and will deny their Motion as to Counts I and III. DMAS' Motion to Dismiss (ECF No. 57) will be converted to a Motion for Summary Judgment and granted as to Counts I and III. CMS' Motion for Summary Judgment

---

464 F.3d 480, 490 (4th Cir. 2006). Additionally, Virginia's Administrative Process Act provides a process for providers to appeal reimbursement decisions affecting both managed care and fee-for-service members. *See* Va. Code § 2.2-4018 *et seq.*

(ECF No. 54) as to Count II will be denied but will be granted as to Count III.  The

Amended Complaint (ECF No. 41) as to Counts I and III will be dismissed with

prejudice.

An appropriate Order will accompany this Memorandum Opinion.

/s/

Henry E. Hudson
Senior United States District Judge

Date: April 27, 2023
Richmond, Virginia

62